**United States Court of Appeals**

**FOR THE EIGHTH CIRCUIT**

_____

No. 96-2033

_____

United States of America,           *
                                     *
    Plaintiff - Appellee,            *   Appeal from the United States
                                     *   District Court for the
    v.                               *   District of Minnesota.
                                     *
Martin Ole Gjerde,                   *
                                     *
    Defendant - Appellant.           *

_____

Submitted:  November 20, 1996

Filed: April 7, 1997

_____

Before FAGG, WOLLMAN, and HANSEN, Circuit Judges.

_____

HANSEN, Circuit Judge.

    Martin O. Gjerde appeals his conviction for conspiring to defraud an agency of the United States in violation of 18 U.S.C. § 371 (1994).  He argues that the evidence was insufficient to support his conviction, that the district court[1] erred in admitting hearsay evidence at his trial, and that the district court erred in determining his sentence.  We affirm.

_____

[1]The Honorable David S. Doty, United States District Judge for the District of Minnesota.

I.


The charges in this case arose from a conspiracy to defraud the United States Department of Housing and Urban Development (HUD) in order to obtain HUD funds. The United States Congress annually appropriates tax dollars to HUD for the Community Development Block Grant Program, which includes the Small Cities Grant Program. HUD releases the Small Cities Grant Program funds to the states, which in turn make the funds available to communities to establish new economic development. The Minnesota Department of Trade and Economic Development (MDTED) is the Minnesota agency in charge of disbursing these HUD funds, in accordance with HUD rules and regulations.

Clarkfield Drying, Inc. (CDI) was a Minnesota corporation established by two brothers, Clark Field and Richard Field, to operate a whey drying plant located in Clarkfield, Minnesota. The Field brothers sought financing for the purchase of equipment and for other operational costs for the new plant. On behalf of CDI, the brothers approached the City of Clarkfield to apply for a $282,000 loan through the HUD Small Cities Grant Program. In their application for the HUD funds, the Field brothers stated that to be successful, CDI would require, among other things, an additional $292,000 of private financing. When the city applied to MDTED for the purpose of loaning the funds to CDI, MDTED responded that before it would release the HUD funds, it would need proof through a loan commitment letter that CDI had obtained the private financing. In addition, under the funding agreement between the city and CDI, CDI would have to prove that the money from the private financing had been spent on CDI equipment and that the City of Clarkfield would be in the first security position on the CDI equipment.

The Field brothers proceeded to seek private financing for CDI. After unsuccessfully pursuing other avenues of obtaining the money,[2] the Field brothers sought a $292,000 loan from the Bonanza Valley State Bank (the bank) in Brooten, Minnesota. Richard Field approached Martin Gjerde, the president of the bank who had a long-standing relationship with Field, for a loan. Gjerde refused to loan the funds to CDI, however, because the City of Clarkfield was out of the bank's service area (90 miles away), CDI was a new company, and Gjerde had no experience with Clark Field, who was to run the operation.

Clark and Richard Field then proceeded to create a corporation named Minnewaska Capital Investment, Inc. (Minnewaska), in Glenwood, Minnesota, a city within the bank's service area. Minnewaska was a holding and leasing company for CDI, with Richard Field named as president and Clark Field named as treasurer. The Fields then approached Gjerde for a $292,000 bank loan to Minnewaska, to provide private financing for CDI. Gjerde approved the loan, without requiring the Fields to fill out a loan application or to submit any evidence of Minnewaska's financial status.

The transactions between Gjerde (on behalf of the bank) and the Fields (on behalf of CDI and Minnewaska) took place on August 21, 1989, and proceeded as follows. First, the bank loaned

---

[2]At one point, Clark and Richard Field obtained a false letter of credit from Rudell Oppegard, the president of Twin Valley State Bank in Twin Valley, Minnesota, conditionally committing the bank to a $292,000 loan. As a result of their conspiracy to obtain HUD money through fraudulent means, Oppegard and the Field brothers were convicted of conspiring to defraud the government in violation of 18 U.S.C. § 371. See United States v. Clark Beach Field, No. 96-1588 (8th Cir. Apr. __, 1997); United States v. Richard William Field, No. 96-1589 (8th Cir. Apr. __, 1997).

3

$292,000 to Minnewaska.  The loan papers were signed by Gjerde, Clark Field, and Richard Field.  Next, Minnewaska immediately transferred the $292,000 to CDI.  Within a minute of this transfer of funds, CDI paid $173,000 (59% of the loan) back to Minnewaska, which then repaid that amount to the bank.  The remaining $119,000 of the bank loan was left in CDI's checking account, but the money was never available for use by CDI. Gjerde put a hold on the Minnewaska and CDI checking accounts, preventing the Fields from accessing the proceeds of the bank loan.  He noted this in a comment in the loan file, stating:

> This loan is being granted and security looked at only on the basis that the proceeds of this loan never leave[] accounts that have been set up at Bonanza Valley State Bank and security that is offered for them.  Holds have been put on each of [the] checking accounts . . . .

(Appellee's App.  at 10.)  In accordance with Gjerde's comment on the loan, the bank returned and refused to honor several checks written on the CDI bank account, despite its healthy account balance.[3]

On September 28, 1989, Kevin Stroup, an attorney representing the City of Clarkfield, telephoned Gjerde to inquire about the bank loan. Stroup told Gjerde that, to obtain the HUD Small Cities Grant Program funds, the Fields were required to secure $292,000 of private financing and to show that the proceeds of the financing

---

[3]Over a year later, an Assistant County Attorney filed an insufficient-funds check charge against Clark Field based on a check that had bounced in September 1989.  Gjerde provided a letter on Field's behalf, explaining that the account was used as security on the bank loan and that the check had been returned for insufficient funds because a hold had been placed on the account. As a result of Gjerde's representations, the charge against Clark Field was dropped.

4

had been used to purchase CDI equipment. Gjerde informed Stroup that the bank had lent $292,000 to Minnewaska, and Stroup requested documentation of the loan.

Gjerde sent the loan documents to Stroup, showing that the bank had lent $292,000 to Minnewaska, which in turn was transferring the funds to CDI. Gjerde also represented to Stroup on several occasions that approximately $170,000 of the bank loan had been spent on equipment as agreed upon under the funding agreement between the city and CDI. Gjerde never informed Stroup at any time that the $173,000 had in fact been repaid to the bank or that holds had been placed on the CDI and Minnewaska checking accounts to ensure that the remaining $119,000 did not leave the bank.

On November 8, 1989, Gjerde negotiated with Stroup to maintain the bank's first security position on the cash in the Minnewaska and CDI bank accounts until the funds had been fully spent on equipment. Under Gjerde's proposal, the city would have a first security interest once CDI had used the money to purchase equipment for the whey drying plant. The city agreed to this plan because the contract between the city and CDI required that the HUD funds be spent on equipment. On November 29, 1989, Gjerde confirmed to Stroup that CDI had spent all the proceeds of the bank loan on equipment and the CDI account had a zero balance.

Stroup sent the bank loan documents to a senior loan officer at MDTED, Nancy Johnson, and told her of Gjerde's assurance that the proceeds of the bank loan had been spent on equipment. The Fields also sent documents to Johnson, representing that the money had been spent on equipment. Based on this information, Johnson authorized the release of funds from the HUD Small Cities Grant Program to the city. On December 13, 1989, the city loaned

5

$282,000 to CDI, $232,000 of which was transferred to the CDI checking account at the Bonanza Valley State Bank.

The Fields repaid the balance of the bank loan within three months of the execution of the loan. A $115,000 check was made payable from the CDI account to the bank on November 9, 1989, one day following the consent agreement between the bank and the city concerning the priority of their security interest. The final payment, including $3,571.40 in purported interest, was made on December 13, 1989, after the HUD funds had been deposited in the CDI account.

CDI eventually defaulted on the HUD loan. Stroup's law firm then hired an investigator to identify the whereabouts of the HUD funds. When the investigator spoke with Gjerde about the bank loan, Gjerde described it as a "paper transaction."

The City of Clarkfield also hired a CPA to trace the HUD funds loaned to CDI. The CPA concluded that the $292,000 purported loan from the bank "did not provide any capital on a long term basis to the business, as the money was advanced and returned well in advance of the time it should have been returned either to investors or to the bank." (Trial Tr. III at 39.) The CPA testified that the sequence of the transactions was not necessarily uncommon, but the loan was not valid to fulfill CDI's obligation to obtain the private financing in order to qualify for the HUD funds. She described the purported loan as "a bogus transaction with no actual capitalization to the corporation." (Id.)

On September 21, 1994, Gjerde was charged in a Second Superseding Indictment on one count of conspiracy to defraud the United States in violation of 18 U.S.C. § 371 and four counts of

6

mail fraud in violation of 18 U.S.C. §§ 2 and 1341.[4]  The case proceeded to trial.  Stroup, the attorney who had represented the City of Clarkfield, testified that he would not have approved the loan to CDI if he had seen the loan comment sheet prepared by Gjerde stating that the bank loan was being made on the condition that the money never leave the bank.  Likewise, Johnson, the senior loan officer at MDTED assigned to the CDI loan, testified that she would not have approved the release of the HUD money to the city if she had seen the loan comment sheet.

A jury found Gjerde guilty of conspiring to defraud the United States in violation of 18 U.S.C. § 371, but not guilty on the mail fraud charges under 18 U.S.C. §§ 2 and 1341.  The district court entered a judgment, sentencing Gjerde to thirty-three months of imprisonment, two years of supervised release, and restitution in the amount of $5,000.  Gjerde appeals, arguing that the evidence was insufficient to support his conviction, the district court erred in admitting hearsay evidence, and the district court erred in sentencing him.

---

[4]The Field brothers were also charged in the same superseding indictment with violations of the mail fraud and conspiracy statutes arising out of this conspiracy.  In addition, they were charged with similar counts arising out of a separate conspiracy to obtain HUD funds through fraudulent activities with Oppegard, see supra n.2.  The Fields were found guilty on the latter charges and then entered into a plea agreement with the United States with regard to the charges arising out of their conspiracy with Gjerde. Under the agreement, the government dropped the mail fraud charges, but the Field brothers pled guilty to the conspiracy charge.

7

## A. Sufficiency of the Evidence

Gjerde first contends that the evidence is insufficient to prove he was guilty of participating in any conspiracy. We consider the evidence in the light most favorable to the guilty verdict, giving the government the benefit of all reasonable inferences that might be drawn from the evidence. United States v. Koskela, 86 F.3d 122, 126 (8th Cir. 1996). We will overturn a jury verdict only when no reasonable jury could have found the defendant guilty beyond a reasonable doubt. United States v. Reeves, 83 F.3d 203, 205-06 (8th Cir. 1996).

To find Gjerde guilty of conspiring to defraud the United States in violation of 18 U.S.C. § 371,[5] the jury had to conclude that a conspiracy existed in this case and that Gjerde was a participant in the conspiracy. A conspiracy exists when at least two people knowingly participate in an agreement to defraud the United States or a United States agency and at least one of the parties performs an overt act in furtherance of the conspiracy. 18 U.S.C. § 371; United States v. Campbell, 848 F.2d 846, 851 (8th Cir. 1988). Circumstantial evidence, including the alleged conspirators' conduct and any attending circumstances, may prove the existence of an agreement, particularly evidence indicating

---

[5]Title 18 U.S.C. § 371 states:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of theconspiracy, each shall be fined under this title or imprisoned not more than five years, or both. . . .

8

that the parties "acted in concert to achieve a common goal." <u>Hamling v. United States</u>, 418 U.S. 87, 124 (1974); <u>Campbell</u>, 848 F.2d at 851. Once the conspiracy is established, the government need only offer slight evidence connecting a particular defendant to the conspiracy. <u>United States v. Jenkins</u>, 78 F.3d 1283, 1287 (8th Cir. 1996).

Gjerde claims the evidence was insufficient to establish beyond a reasonable doubt that he knew of the conspiracy or of the conspiracy's general purpose and scope. We disagree. Gjerde knew that the Field brothers needed to obtain $292,000 in matching funds in order to qualify for the HUD money. He also knew the $292,000 bank "loan" to CDI through Minnewaska was merely a paper transaction. Yet, when the city attorney discussed the matching-fund requirement with Gjerde, Gjerde represented that the bank had provided the requisite private financing and did not explain that CDI had in fact received no capitalization from the loan.

Besides Gjerde's knowledge and misrepresentation about the bank loan itself, Gjerde knew the Fields were required to use the bank proceeds to purchase equipment for CDI. In furtherance of the conspiracy, Gjerde falsely represented that the entire proceeds of the bank loan had been spent on equipment, when in fact they had never left the bank. He also fostered the city's misunderstanding of the nature of the bank loan by negotiating with the city regarding the priority of the security interests, all the while knowing that the bank-loan transaction had provided no capitalization to CDI and there would be no expenditure of the bank-loan proceeds on equipment. It is but a small inferential step from the record evidence to conclude that Gjerde knew the city attorney would rely on the bank-loan documentation and Gjerde's representations, as well as the documentation from the Field brothers, to induce the senior loan officer at MDTED to release the

HUD funds to the city. Given the overwhelming evidence in this record, we believe a reasonable jury could have concluded beyond a reasonable doubt that Gjerde knew of the conspiracy's purpose and scope, and that he willingly and knowingly played a key role as a participant in it.

Gjerde argues that, although he did not explicitly tell the city attorney he had frozen the CDI and Minnewaska checking accounts, he nonetheless put the city attorney on notice of this by sending the attorney the bank-loan documents. Included among the documents was an assignment signed by both Clark and Richard Field, which stated: "I understand that I may not withdraw any money from my account without your permission until my debts have been paid." (Trial Tr. III at 141.) Gjerde maintains that this assignment revealed the nature of the bank loan. We cannot agree that the Field brothers' agreement to obtain bank authorization for expenditures put the city attorney on notice that Gjerde had absolutely frozen the CDI and Minnewaska checking accounts. When reading the assignment, the city attorney could easily have assumed that the bank would approve expenditures for CDI equipment, in accordance with the HUD funding agreement. This assumption would be quite reasonable given that Gjerde had indicated his understanding of the expenditure requirement. Thus, the documentation of the assignment did not notify the city attorney of the holds on the accounts.

Gjerde next argues on two grounds that the evidence was insufficient to support the verdict because the conspiracy was not one to defraud the United States or any agency thereof. First, he contends that the money fraudulently borrowed by the Field brothers was money belonging to the city, not to HUD. Thus, Gjerde argues, the object of the conspiracy was to defraud the City of Clarkfield, not the federal government. Second, Gjerde claims that because no

10

federal statute required the city to impose its matching loan requirement, the conspiracy could not have been to defraud the federal government.

Section 371 prohibits two distinct types of conspiracies: (1) conspiracies "to commit any offense against the United States," and (2) conspiracies "to defraud the United States or any agency thereof." 18 U.S.C. § 371; United States v. Wicker, 80 F.3d 263, 267 (8th Cir. 1996). In the instant case, Gjerde was charged with the second type of conspiracy.[6] To support a conviction of conspiracy on this charge, the government had to prove that the United States or one of its agencies was the target of the alleged conspiracy. Tanner v. United States, 483 U.S. 107, 130 (1987). A conspiracy targeted at the United States or one of its agencies may be achieved by using third parties to effect the conspiracy, because section 371 does not limit the method by which the conspirators may plan to defraud the United States. Id. at 129.

Based on the evidence at trial, a reasonable jury could have concluded that the target of the conspiracy was HUD, as represented by MDTED, the state agency that administered the HUD Small City Grant Program funds. Although, as Gjerde emphasizes in his briefs,

_____

[6]The Second Superseding Indictment charged Gjerde with

knowingly and willfully conspir[ing with Clark and Richard Field] . . . to defraud the United States of America of funds belonging to the United States of America's Department of Housing and Urban Development, with the object of the conspiracy being to obtain those funds in the form of an approximately $282,000 loan from the HUD Small Cities Grant Program . . . .

(Clerk's R. at 129.)

11

the HUD money was <u>granted</u> to the state, <u>see</u> 42 U.S.C. § 5303,[7] that grant was subject to substantial federal regulation, <u>see</u> <u>id.</u> §§ 5304-5321; 24 C.F.R. 570.420 - .432 (1997). Consequently, the funds did not lose their federal character, and MDTED was simply a state agency charged with administering the federal program. <u>Cf.</u> <u>United States v. Long</u>, 996 F.2d 731, 732 (5th Cir. 1993) (explaining that question of whether funds lose their federal character for purposes of 18 U.S.C. § 641 (conversion of federal funds) is measured by the control and the supervision the federal government exercises); <u>United States v. Foulks</u>, 905 F.2d 928, 930 (6th Cir. 1990) (holding, in the context of a prosecution under 42 U.S.C. § 641, that "[w]here the government retains power over grant funds, those funds retain their federal character even though deposited into accounts of non-federal agencies"); <u>United States v. Johnson</u>, 596 F.2d 842, 845-46 (9th Cir. 1979) (holding that HUD funds disbursed to the San Francisco Redevelopment Agency were property of the federal government). Thus, MDTED was acting as an agent of HUD, and any conspiracy to defraud MDTED with regard to the HUD Small Cities Grant Program funds was in effect a conspiracy against HUD itself. Gjerde and the Fields used the city to perpetrate their fraud against HUD, but this does not alter the conclusion that the object of their conspiracy was to defraud HUD in order to obtain the federal funds. <u>Tanner</u>, 483 U.S. at 129. Further, it is of no consequence that the HUD money eventually passed through the city's hands before making its way to CDI; the important fact is that the federal government was the target of the

---

[7]This section states:

> The Secretary is authorized to make grants to States, units of general local government and Indian tribes to carry out activities in accordance with the provisions of this chapter. . . .

12

conspiracy between the Fields and Gjerde.  See Tanner, 483 U.S. at 130.

We also reject Gjerde's argument based on the fact that the government's case fails because the conspiracy did not violate a federal statute or regulation.  That the state (not the federal government) instituted the matching-funds requirement is immaterial to our inquiry, because Gjerde was charged with conspiracy to defraud the United States, not conspiracy to commit an offense against the United States.  See 18 U.S.C. § 371.  While allegations of a conspiracy to commit an offense against the United States would require proof of an agreement to violate a federal statute or regulation, allegations under the other conspiracy clause, that is, a conspiracy to defraud the United States, do not engender that same requirement.  Compare Tanner, 483 U.S. at 128-130 (discussing the intent requirement for a "conspiracy to defraud the United States") with Wicker, 80 F.3d 267 (discussing the intent requirement for a "conspiracy to commit any offense against the United States").

For these reasons, we conclude that the evidence the government submitted to the jury was sufficient to prove beyond a reasonable doubt that Gjerde knowingly participated in a conspiracy to defraud an agency of the United States.

B.  Admission of Coconspirator's Statement

Gjerde contends the district court committed reversible error in admitting testimony concerning a statement Richard Field made to an FBI agent in 1993.  "We review the evidentiary rulings of a district court only for abuses of discretion, and will reverse only when an improper evidentiary ruling affects the substantial rights of the defendant or when we believe that the error has had more

13

than a slight influence on the verdict." United States v. Ballew, 40 F.3d 936, 941 (8th Cir. 1994) (citations omitted), cert. denied, 115 S. Ct. 1813 (1995); see also Fed. R. Crim. P. 52(a) (harmless error standard).

The record reveals the following testimony at the trial:

PROSECUTOR:  Now, during the course of your investigation of this case, did you also interview Richard Field?

FBI AGENT:  Yes, I did.

PROSECUTOR:  And when was that?

FBI AGENT:  That interview took place at Mister Field's place of business on July 22nd, 1993.

PROSECUTOR:  And did Mister Field tell you anything about why Minnewaska Capital Investment Corporation was set up?

GJERDE'S ATTORNEY:  I object, Your Honor.  His conversation with Mister Field is hearsay in this trial.

COURT:  Overruled, under Bell or [Bourjaily].  Go ahead.

FBI AGENT:  Yes -- I believe your question was how Mister Field described Minnewaska Capital Investment?

PROSECUTOR:  That is right.  What did he tell you about why it was set up and how it was set up?

FBI AGENT:  We had an extended conversation with regard to Minnewaska Capital Investments.  And the final statement made by Mister Richard Field to me was that Minnewaska Capital Investment was nothing more than a straw company set up to act as a facilitator for the loan from Bonanza Valley State Bank to Clarkfield Drying, Incorporated.

PROSECUTOR:  I have no further questions at this time.

(Trial Tr. III at 133-34.)

14

The district court admitted the FBI agent's testimony about Richard Field's description of Minnewaska under Federal Rule of Evidence 801(d)(2)(E), which states that a coconspirator's statement in the course of and in furtherance of the conspiracy is not hearsay evidence. See Bourjaily v. United States, 483 U.S. 171, 173 (1987); United States v. Bell, 573 F.2d 1040, 1044 (8th Cir. 1978) (setting forth the procedure for conditionally admitting conspirator statements). Gjerde argues that Richard Field's statement, made more than three and a half years after the Fields obtained the HUD funds, does not fall within the terms Rule 801(d)(2)(E), because it was not made in the course of or in furtherance of the conspiracy. Gjerde further argues that the admission of the testimony was prejudicial because it indicates Gjerde's participation in an overt act in furtherance of the conspiracy.

The government counters that the admission of Richard Field's statement was not error. The government contends, on the basis of United States v. Askew, 958 F.2d 806, 812 (8th Cir. 1992), that Gjerde bears the burden of proving the conspiracy had actually ended at the time of Field's statement and that Gjerde failed to meet this burden. The government also argues that, if the statement was erroneously admitted, the admission was harmless error. See Fed. R. Crim. P. 52(a).

A declarant's out-of-court statement is admissible under Rule 801(d)(2)(E) if the government proves by the preponderance of the evidence that (1) a conspiracy existed, (2) the declarant was the defendant's coconspirator, and (3) the statement was made during the course of and in furtherance of the conspiracy. United States v. Darden, 70 F.3d 1507, 1529 (8th Cir. 1995), cert. denied, 116 S. Ct. 1149 (1996) and Hopkins v. United States, 116 S. Ct. 2567 (1996). In the instant case, we have already concluded that the

15

government established beyond a reasonable doubt the existence of a conspiracy involving both Richard Field and Gjerde as coconspirators. Thus, the only remaining issue is whether Richard Field's statement was made in the course of and in furtherance of the conspiracy.

As a preliminary matter, we note that the government, not Gjerde, bears the burden of establishing that the statement was made "in the course of" the conspiracy, that is, that the conspiracy had not ended before Richard Field made his statement to the FBI agent in 1993. Darden, 70 F.3d at 1529; Bell, 573 F.2d at 1044. Our discussion in Askew, 958 F.2d at 812, on which the government relies for a contrary allocation of the burdens, relates to a sentencing issue, not the admissibility of evidence at trial under Rule 801(d)(2)(E).

Setting aside for a moment the question of whether Richard Field's statement was made "in the course of" the conspiracy, we first look at whether the record shows that Richard Field's statement was made "in furtherance of" the conspiracy. We interpret the "in furtherance of" requirement broadly, finding statements to be in furtherance of the conspiracy if the overall effect of the conversation is to facilitate the conspiracy. United States v. Edwards, 994 F.2d 417, 422 (8th Cir. 1993), cert. denied, 510 U.S. 1048 (1994). "[C]onspirator statements made to a known police agent are admissible under Rule 801(d)(2)(E) only if intended to allow the conspiracy to continue, for example, by misleading law enforcers." United States v. Alonzo, 991 F.2d 1422, 1426 (8th Cir. 1993).

After careful consideration, we conclude Richard Field did not make the statement regarding Minnewaska in furtherance of the conspiracy. The statement could not have been made in furtherance

16

of the conspirators' core criminal objective of obtaining the HUD funds, because Richard Field made the statement three and a half years after the Fields actually obtained the money. As to whether Richard Field was trying to conceal the conspiracy, we must consider the statement in isolation, because there is no elaboration in the record on the overall effect of the conversation between Field and the FBI agent. Considering it so, we conclude Richard Field did not make the statement in an effort to conceal the conspiracy, for it was an admission about why the Fields created Minnewaska and it supports the government's case of conspiracy to defraud the United States. Thus, regardless of whether the statement was made in the course of the conspiracy, we conclude that it was not made in furtherance of the conspiracy and therefore was not admissible under Federal Rule of Evidence 801(d)(2)(E).

Nonetheless, the hearsay evidence was admissible under Federal Rule of Evidence 804(b)(3) as a statement against interest. Under Rule 804(b)(3), a statement against penal interest is not excluded as hearsay if "(1) the declarant is unavailable as a witness, (2) the statement . . . so far tend[s] to subject the declarant to criminal liability that a reasonable person in the declarant's position would not have made the statement unless he or she believed it to be true, and (3) corroborating circumstances clearly indicate the trustworthiness of the statement." United States v. Mendoza, 85 F.3d 1347, 1351 (8th Cir. 1996). At the time of Gjerde's trial, Richard Field was not available as a witness. He had pled guilty to the conspiracy and had asserted his Fifth Amendment right against self-incrimination pending his appeal. See United States v. Duchi, 944 F.2d 391, 394 (8th Cir. 1991). Richard Field's statement that Minnewaska had been created as a straw company to facilitate the bank loan was against his penal interest at the time he made it, because there was an investigation under

17

way and the statement gave credence to the government's suspicion that the Field brothers had manipulated the situation to make it appear as if CDI had secured private financing from the bank, when in fact the bank "loan" provided absolutely no capital to CDI. Finally, the statement was corroborated by Gjerde's own statement that the loan to Minnewaska passing through to CDI was merely a paper transaction. Thus, the evidence was admissible under Rule 804(b)(3).

Even if the evidence had been inadmissible, the error would have been harmless in this case, because the other overwhelming evidence was more than sufficient to prove Gjerde's participation in the conspiracy beyond a reasonable doubt. The record reveals many acts in furtherance of the conspiracy, including Gjerde's own misrepresentations to the city attorney. Furthermore, given Gjerde's own description of the loan as a paper transaction, Richard Field's statement did not really add anything to the nonhearsay evidence in the record. Thus, we conclude that any evidentiary error regarding the statement would not have affected Gjerde's substantial rights. Fed. R. Crim. P. 52(a); <u>Ballew</u>, 40 F.3d at 941.

Gjerde also maintains that the prosecutor's reference in his closing argument to Richard Field's statement constituted prosecutorial misconduct. There was no prosecutorial misconduct here, because the evidence was admissible and the prosecutor was therefore free to refer to it in closing arguments. <u>See</u> <u>United States v. Goodlow</u>, 105 F.3d 1203, 1207 (8th Cir. 1997) (standard for examining claims of improper prosecutorial comments).

C. Sentencing Issues

Finally, Gjerde raises several challenges to the district court's calculation of his sentence under the United States Sentencing Guidelines. First, Gjerde argues the district court improperly enhanced his sentence for obstruction of justice on the basis that Gjerde perjured himself at trial. A two-level increase is appropriate "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing or the instant offense." United States Sentencing Commission, Guidelines Manual, § 3C.1.1 (Nov. 1995). It is well established that perjury at trial amounts to an obstruction of justice. United States v. Thomas, 93 F.2d 479, 489 (8th Cir. 1996). "A witness commits perjury if he gives false testimony concerning a material matter with the wilful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." Id. (internal quotations omitted). "The district court must review the evidence and make [an] independent finding, by a preponderance of the evidence, of perjury in order to impose a sentence enhancement for obstruction of justice." Id. In conducting this review, the court must evaluate the defendant's testimony in the light most favorable to him. United States v. Scott, 91 F.3d 1058, 1063 (8th Cir. 1996). Because a decision to apply an enhancement for obstruction of justice rests on the district court's factual findings, we review that decision for clear error. Thomas, 93 F.3d at 488-89.

The district court's decision in this case was not clearly erroneous. Examining the testimony in the light most favorable to Gjerde, the district court found that Gjerde testified falsely in an attempt to affect the outcome of his case. For example, contrary to a memorandum written by Gjerde indicating that the bank's loan was merely a paper transaction and that he never

19

intended to disburse the funds to the Fields, Gjerde testified at trial that the bank's loan to the Fields was legitimate. Also in direct conflict with the evidence, Gjerde also testified that he did not withhold information from the city's attorney and that the bank intended to disburse the loan to the Fields. Considering these statements, and others, we agree with the district court that enhancement under § 3C1.1 is appropriate, and we find no clear error. Thomas, 93 F.3d at 489; see also United States v. Dunnigan, 507 U.S. 87, 95-96 (1993) (finding an enhancement for obstruction of justice amply supported where the defendant failed to give truthful answers on material matters in an attempt to affect the outcome of the case).

Gjerde also challenges the enhancements of his sentence based upon his role in the offense. The district court applied a two-level enhancement for more than minimal planning, USSG § 2F1.1(b)(2), and a two-level enhancement for abuse of a position of trust, USSG § 3B1.3. Gjerde argues not only that the enhancements were improper, but also that he deserved a reduction because of his minor role in the offense. See USSG § 3B1.2(b). We review the district court's factual determination of a participant's role in the offense for clear error. United States v. Maxwell, 25 F.3d 1389, 1399 (8th Cir.), cert. denied, 115 S. Ct. 610 (1994).

The district court's decision to apply a two-level enhancement under section 2F1.1(b)(2) of the Guidelines for more than minimal planning was not clearly erroneous. "`More than minimal planning' is deemed present in any case involving repeated acts over a period of time, unless it is clear that each instance was purely opportune." Id. § 1B1.1(f). Gjerde approved of the bank "loan" to Minnewaska; he put a hold on the Minnewaska and CDI accounts; and he represented that CDI had obtained financing from the bank for

the purpose of purchasing equipment and, later, that equipment had been purchased. These acts and others were thoughtful and complex, and extended over a period of several months. The district court did not clearly err in applying the enhancement for more than minimal planning.

Likewise, the denial of Gjerde's motion for a reduction for being a minor participant was not clear error. Gjerde bears the burden of proving that he is entitled to a reduction for being a minor participant. United States v. Thompson, 60 F.3d 514, 517 (8th Cir. 1995). He cannot meet that burden simply by proving that he is less culpable than his coconspirators when the evidence indicates that he was "deeply involved" in the criminal acts. Id. at 517-18. This record demonstrates that Gjerde was a key player in the conspiracy, for without him, the Fields could not have represented that they had obtained the matching private financing required to obtain the HUD funds. Although he may have been less culpable in some sense than the Field brothers, on this record, Gjerde simply cannot show he was merely a minor participant.

Finally, the district court did not clearly err in finding that Gjerde abused a position of trust in committing this crime. Gjerde was entrusted by the bank's board of directors to conduct the bank affairs in a forthright manner and to assure compliance with bank policies and federal regulations. His position allowed him to structure the loan to CDI through Minnewaska with little or no scrutiny. A situation like this is exactly what the Sentencing Commission had in mind for the enhancement for abuse of a position of trust. See USSG § 3B1.3, comment. (n.1) (giving as an example "a bank executive's fraudulent loan scheme"). The enhancement for Gjerde's abuse of his position of trust was proper.

III.

For the reasons stated above, we affirm the judgment of the district court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.