151 F.3d 1034
 82 A.F.T.R.2d 98-5355
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Dorothy RIVERS, Defendant-Appellant.
 No. 97-4016.
 United States Court of Appeals, Seventh Circuit.
 Argued May 29, 1998.
Decided July 9, 1998.
 
 Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 96 CR 275. Robert W. Gettleman, Judge.
 Before Hon. WALTER J. CUMMINGS, Hon. KENNETH F. RIPPLE, Hon. TERENCE T. EVANS, Circuit Judges.
 
 ORDER
 
 1
 In April 1996 a 40-count indictment was returned against defendant Dorothy Rivers charging her with fraud, theft, obstruction, tax evasion and other crimes.[1] She pled guilty in accordance with North Carolina v. Alford, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162, to eliminate the possibility of a more serious sentence. She received concurrent sentences of 70 months on Counts 23-26, 60 months on Counts 1-23 and 27-37, and 12 months on Counts 38-40. She was also sentenced to a three-year term of supervised release and ordered to pay a special assessment of $1,925.
 
 Facts
 
 2
 Defendant was employed for more than 30 years by Michael Reese Hospital in its Department of Psychiatry. The Psychiatric Department received grants for its programs, including the Pritzker-Grinker Unit. In 1983 the hospital phased out the Pritzker-Grinker Unit, which had an outpatient clinic for behavioral-disordered, emotionally disturbed children.
 
 
 3
 In July 1983, defendant incorporated the Chicago Mental Health Foundation and the Pritzker-Grinker School. They were housed at 6140 South Drexel Avenue in Chicago and operated social programs funded by grants and contracts with government agencies.Defendant was the School's executive administrator and managed all its operations. Commencing in 1983 until 1994, the School was awarded contracts with the Chicago Board of Education to provide special education to children with behavioral disorders and other special needs.
 
 
 4
 Also commencing in 1983, defendant sought funding for the Foundation of which she was the president. From 1985 through 1992 the Foundation was employed by contract to operate the Quality of Life Teen Community Center for the Illinois Department of Children and Family Services ("DCFS"). The Foundation gave shelter to pregnant teen wards of Illinois. From 1985 through 1992 defendant signed annual contracts for DCFS funds totaling more than $7 million.
 
 
 5
 In 1985 the Foundation was awarded a series of contracts with the City of Chicago Department of Human Services. Defendant signed contracts to provide transitional housing for the homeless from 1985 to 1990. The Foundation also received a contract to pay for rehabilitation and repairs of its fifth-floor shelter. In 1987 Congress passed the McKinley Homeless Assistance Act earmarking funds for facilities with residential programs to help the homeless move from shelters to permanent housing within 24 months. Defendant was selected to receive $5.3 million in grants to be paid over five years. Between March 1988 and March 1991 the Foundation drew $2.5 million from the HUD grants.
 
 
 6
 Under these various grants and contracts, the Foundation and the School were to spend the money solely on program-related costs and to submit accurate financial reports. In addition, the HUD program required defendant to match the funds with money from nonfederal sources.
 
 
 7
 From 1984 until 1993 defendant enriched herself by defrauding all the grantor agencies and their beneficiaries. She fraudulently induced the awards and continued funding and when the money became available she misappropriated $1.5 million for herself and concealed her misappropriations. To obtain these monies defendant lied to the agencies in various matters. Thus as to the DCFS contract, defendant inflated costs and listed fictitious employees. The business expenses were inflated to conceal personal payments to defendant's son and chauffeur. As to the City of Chicago Department of Human Services, defendant sent reimbursement vouchers that falsified repair costs and altered vendor invoices.
 
 
 8
 As to the Board of Education contracts with the Pritzker-Grinker School, defendant listed ghost officers and kept false records to conceal cash that she took from the School. She made it appear that $6,000 monthly checks payable to her were disbursed to others as payroll cash. She inflated expenses in financial statements and reports from the School to an Illinois watchdog agency.
 
 
 9
 Defendant diverted from the bank accounts more than $1.2 million that was to be used for the homeless residents and the teen mothers at the Foundation and the emotionally disturbed students at the School. She used the money to pay cash to herself and her son, to make her own mortgage payments, to buy expensive clothing and make payments on a Mercedes-Benz automobile, to underwrite lavish parties, decorations and liquor and to make campaign contributions and payoffs to DCFS and bank employees.
 
 
 10
 During her misappropriation period, both the Foundation and the School suffered severe cash shortages. Payroll taxes, Social Security taxes and health insurance premiums were not paid, and the programs were strapped for cash and supplies.
 
 
 11
 To avoid detection, defendant used a "cash payroll" and nominees to cash checks and return the proceeds to her. She secondarily endorsed cashier's checks and misidentified the nature of the payments on the books of the Foundation and the School. To conceal the source of payments from vendors, she used counterchecks and cashier's checks that identified her as the remitter. She also kept the books in disarray and hired separate accountants for the Foundation and the School and kept them in the dark.
 
 
 12
 Defendant obstructed a 1991 audit by HUD. She lied orally and in writing about the receipt of matching funds and handed HUD auditors false deposit schedules, fictitious letters and other false schedules that inflated personnel costs.
 
 
 13
 Because of the irregularities the auditors found, HUD withdrew its grants and in 1992 moved the residents to substitute shelters run by the City of Chicago. The Chicago Department of Human Services refused to enter contracts with the Foundation after 1990, as did DCFS in the latter half of 1992. The School eventually went bankrupt.
 
 
 14
 Defendant violated 18 U.S.C. § 666 by misappropriating more than $50,000 of HUD grant money and using it to pay for party decorations, operational expenses of a recording company, utility bills for her residence and real estate taxes on a friend's motel.
 
 
 15
 Six false statements defendant made to HUD auditors formed the basis for her false statement convictions. The documents were meant to conceal from the auditors her misappropriation of grant funds. She also sent the Program Section of HUD a letter falsely representing that the Foundation's matching funds included non-resident commitments. As to tax offenses, she wilfully failed to file tax returns for 1989-1994. During 1989-1991 she evaded taxes by causing the Foundation and School to pay her personal expenses which she falsely represented as business expenses; she used undetectable cash and cashier's checks; she also used nominees to obtain cash and constructed the books to make it appear that payments shown were reimbursements of loans. She refused to file tax returns despite her personal accountant's warnings.
 
 Sentencing
 
 16
 Before her sentencing, defendant unsuccessfully filed a motion for a downward departure for diminished mental capacity. She also filed objections to the sentencing adjustments including (1) abuse of trust and (2) obstruction of justice. As to the abuse of trust objection to the presentence report, the defendant claims she did not have unfettered discretion in the running of both organizations. However, the government submitted grand jury testimony under seal showing that the Foundation's Board of Directors rarely met or set policy.
 
 
 17
 The government sought an obstruction of justice adjustment under Guidelines § 3C1.1 on the following grounds: (1) Mandatory enhancement pursuant to then Application Note 6 (now 7) of Guidelines § 3C1.1; (2) making materially false statements to law enforcement officers; (3) producing false records, and (4) attempting to influence two witnesses.
 
 
 18
 At the two-day sentencing hearing, defendant objected to the loss calculations and relied on her motion for downward departure. The district court found that defendant abused private and public trusts and increased her offense level pursuant to Guidelines § 3B1.3. It noted that the Board of Directors relied on good faith in its employees and trusted that defendant was doing her job right, whereas she abused her position. Judge Gettleman remarked that it was evil for defendant to destroy two organizations serving the neediest of citizens and that her abuses caused the demise of the social programs offered by the Foundation and the School.
 
 
 19
 The court increased defendant's offense level by two levels under Guidelines § 3C1.1 because defendant was convicted of the obstruction offense and the underlying offense (the offense with respect to which the obstructive conduct occurred) within Application Note 7 to that Guideline.
 
 
 20
 The court imposed a sentence of 70 months in prison on Counts 21-26 because defendant's conduct was "probably the most egregious conduct of any criminal defendant" that the judge had before him.
 
 
 21
 Defendant's sentence was properly increased for abuse of trust
 
 Guidelines § 3B1.3 provides as follows:
 
 22
 Abuse of Position of Trust or Use of Special Skill
 
 
 23
 If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels. This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic. If this adjustment is based upon an abuse of a position of trust, it may be employed in addition to an adjustment under § 3B1.1 (Aggravating Role); if this adjustment is based solely on the use of a special skill, it may not be employed in addition to an adjustment under § 3B1.1 (Aggravating Role).
 
 
 24
 In sentencing defendant, Judge Gettleman found that she abused a private trust in the operation of the Foundation and the School and a public trust of grant monies.
 
 
 25
 In the court below defendant objected to the abuse of a private trust enhancement on the ground that she was supervised by a Board of Directors. Now she claims that the Board never functioned as a true Board of Directors (Br.24). Because the latter argument was not raised below, it is waived. United States v. Olano, 507 U.S. 725, 741, 113 S.Ct. 1770, 123 L.Ed.2d 508; United States v. Rivero, 993 F.2d 620, 623 (7th Cir.1993).
 
 
 26
 Here defendant was meant to act in the best interest of the Foundation and the School. Yet as president of the Foundation and executive director of the School, she fraudulently induced the award of grants and stole the agencies' money for her own use and sustained her scheme by abusing a position of trust imparted by the Board of Directors. She fell within Guidelines § 3B1.3 by abusing the private trust imposed on her. United States v. Zaragoza, 123 F.3d 472, 482 (7th Cir.1997); United States v. Bhagavan, 116 F.3d 189, 192-193 (7th Cir.1997); United States v. Gjerde, 110 F.3d 595, 605 (8th Cir.1997).
 
 
 27
 The district court also found that defendant had abused a position of public trust within Guidelines § 3B1.3. She was entrusted with accounting for the grant funds to be used for public purposes. She prepared the false applications, accounting records and agency reports. Defendant was entrusted with accounting for grant funds for public purposes and had unlimited discretion over them. Therefore the district court was correct in finding that here she also abused a public trust. United States v. Lamb, 6 F.3d 415, 419 (7th Cir.1993).
 
 
 28
 Increase of defendant's sentence for obstruction of justice was proper
 
 
 29
 Under Guidelines § 3C1.1 dealing with obstruction of justice, the offense level is to be increased by two levels. Application Note 7 to Guidelines § 3C1.1 provides that where, as here, a defendant is convicted of the obstruction offense and the underlying offense, the count for the obstruction offense is to be grouped with the count for the underlying offense, and the offense level will be that for the underlying offense, increased by the two-level adjustment specified by this section, or the offense level for the obstruction offense, whichever is greater. Here the underlying offense consisting of defendant's lies to investigating agencies plus her obstructing the federal audit satisfy Application Note 7. The district court did not err in applying the two-level enhancement.
 
 
 30
 Since defendant agreed to use the 1997 version of the Guidelines, her present argument that the 1991 version should have been used was waived.
 
 
 31
 Defendant also argues that the obstruction of justice enhancement addressed the very same conduct that led the court to apply a two-level enhancement for an offense involving "more than minimal planning" under Guidelines § 2F1.1(b)(2), thereby resulting in impermissible double counting. See generally United States v. Giacometti, 28 F.2d 698, 702 (7th Cir.1994) (discussing double counting under Sentencing Guidelines). We disagree. The enhancement for more than minimal planning addressed conduct far beyond that on which the obstruction enhancement rested. Defendant engineered an intricate scheme to secure and divert funds from several sources to her own use. Much of this planning had nothing directly to do with the concealment she undertook with respect to the HUD audit-which was the conduct that led to the obstruction of justice enhancement. There was no double counting here.
 
 
 32
 Judgment affirmed.
 
 
 
 [1]
 The violations were alleged under 18 U.S.C. §§ 2, 666, 1001, 1341, 1343 and 1516, and 26 U.S.C. §§ 7201 and 7203