# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 03-2239WA, 03-2394WA

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee/Cross-Appellant, | * | |
| | * | On Appeal from the United |
| v. | * | States District Court |
| | * | for the Western District |
| | * | of Arkansas. |
| Kevin Manfre, | * | |
| | * | |
| Appellant/Cross-Appellee. | * | |

_____

Submitted: January 13, 2004

Filed: May 11, 2004

_____

Before WOLLMAN, RICHARD S. ARNOLD, and MORRIS SHEPPARD ARNOLD, Circuit Judges.

_____

RICHARD S. ARNOLD, Circuit Judge.


Kevin Manfre was convicted for his role in the blowing up of a nightclub in Fort Smith, Arkansas. On appeal, he challenges the conviction on evidentiary grounds and also appeals the sentence imposed. The government cross-appeals also arguing that the District Court failed to impose the proper sentence. We affirm the conviction, disagree with Mr. Manfre's sentencing arguments, and accept the

government's argument in part. Accordingly, the judgment is vacated, and the cause remanded for resentencing in accordance with this opinion.

## I.

We state the facts in the light most favorable to the jury verdict. Mr. Manfre owned and operated the Ozark Sports Club in Fort Smith, Arkansas. In late 1996 or early 1997, Mr. Manfre began planning to build an upscale nightclub next to the sports club with his partner, John Moore. In mid 1997, he secured a one-million-dollar construction loan. Mr. Manfre signed a personal guaranty for the loan and also pledged the sports club as collateral. Construction of the nightclub finished in May of 1998, and it opened for business thereafter.

At some point in 1998, Mr. Manfre hired twenty-one-year-old David Rush to work at the nightclub as a part-time bouncer. Mr. Manfre and Mr. Rush became fast friends, with Mr. Rush looking up to Mr. Manfre as a mentor, and Mr. Manfre considering Mr. Rush a "Little Bro." As will become evident, Mr. Rush is a central player in our evaluation of this appeal.

The nightclub did not fare well. It suffered net losses in the tens of thousands of dollars in 1998, 1999, and 2000. Mr. Manfre became delinquent on his loan payments, fell behind on his property and unemployment taxes, and risked losing both the nightclub and the sports club. On December 29, 2000, Mr. Manfre's loan carrier sent him a notice that final payment on his loan, some $886,580, was due on January 10, 2001. Although he was granted an extension by the bank, Mr. Manfre's financial situation did not improve.

At least as early as January 2001, Mr. Manfre entered into a scheme with Mr. Rush to rid himself of the nightclub and the financial burden it caused. He and Mr. Rush decided that they would burn down the nightclub. On January 8, 2001, Mr.

Manfre sent Mr. Rush, who had then moved to Westminster, Colorado, a Federal Express package. At trial, it was suggested that the package contained the blueprints of the nightclub, as a copy of the prints was found in Mr. Rush's apartment in Colorado after the explosion. The blueprints contained handwritten notes, shown to be in Mr. Manfre's handwriting, instructing Mr. Rush as to certain tactical concerns that he should have in mind in burning down the nightclub. The two agreed that: Mr. Rush would return from Colorado and burn down the night club; he would use gasoline as the accelerant in the fire, and that they would divide the insurance proceeds.

As the planning progressed, Mr. Manfre and Mr. Rush were in frequent contact. Mr. Manfre called Mr. Rush on his cell phone, and Mr. Rush tried to keep his friends from knowing the content of those conversations. On different occasions, however, he admitted to his seventeen-year-old pregnant fiancée, Jessica Van Gaalen, and to his friend, Trevor Mills, that Mr. Manfre had hired him to burn down the nightclub. As the date approached, Mr. Rush became more and more wary of the plan but felt he was obligated to complete the scheme, because he needed the money for his yet unborn child.

On April 23, Mr. Rush returned to Fort Smith. He went to a hardware store and purchased a 30-inch wrecking bar, flashlight, sledge hammer, and duct tape. At approximately two o'clock the next morning, the nightclub exploded, causing a total loss to the building. Mr. Rush died in the explosion. Hours before the blast, Mr. Manfre's truck was seen outside the nightclub with large gasoline tanks in the bed of the truck. A propane tank with its valve open was found inside the charred remains of the nightclub. When Mr. Manfre was questioned about the explosion, he lied, telling investigators that his loan and tax payments for the nightclub were up to date. He also told investigators that he had no idea how Mr. Rush acquired the blueprints to the club. On July 12, 2001, Mr. Manfre signed an insurance claim, swearing he had nothing to do with the explosion.

A year later, Mr. Manfre was indicted by a grand jury on one count of solicitation to commit a crime of violence in violation of 18 U.S.C. § 373, one count of conspiracy to commit arson in violation of 18 U.S.C. § 371, one count of arson involving interstate commerce in violation of 18 U.S.C. § 844(i), one count of causing someone to travel in interstate commerce to commit arson in violation of 18 U.S.C. § 1952(a)(3), and one count of fraud in violation of 18 U.S.C. § 1341. The case proceeded to trial, and Mr. Manfre was found guilty on all charges. He was sentenced to 14 years in prison. This appeal followed.

## II.

Challenging his conviction, Mr. Manfre argues that parts of the testimony of four prosecution witnesses, Gregory Scott Buttler, Scott Strozier, Jessica Van Gaalen, and Trevor Mills, were improperly admitted. We review the challenges in turn.

## A.

Gregory Scott Buttler was Mr. Rush's half-brother, and Mr. Rush resided with Mr. Buttler in Colorado. At trial, Mr. Buttler testified that Mr. Manfre would call Mr. Rush, and that Mr. Rush would take the phone into his bedroom for privacy. Mr. Buttler would know it was Mr. Manfre on the phone because he would answer it first, or would recognize the number on the telephone's caller-identification system. Over a hearsay objection, Mr. Buttler testified that when he asked his brother what Mr. Manfre wanted, Mr. Rush would not say specifically, explaining that "Kevin" wished to keep their plans secret. Mr. Buttler also testified that he heard his brother discussing a propane tank with Mr. Manfre. When asked about the propane tank, Mr. Rush told Mr. Buttler that he and Mr. Manfre were thinking of ways to promote Mr. Manfre's business, such as an outdoor barbeque. After the completion of Mr. Buttler's testimony, the District Court instructed the jury that it could consider the

statements made by Mr. Rush, even though they were made without Mr. Manfre's knowledge and in his absence.

On appeal, Mr. Manfre makes two arguments regarding Mr. Buttler's testimony. First, he argues that the admission of Mr. Buttler's testimony violated the Confrontation Clause of the Sixth Amendment. Second, he argues that the statements of Mr. Rush, as retold by Mr. Buttler, should not have been admitted, as they were not in furtherance of any conspiracy, and thus were hearsay. In reviewing the testimony, we treat separately Mr. Rush's explanation that he could not disclose what he discussed with Mr. Manfre, and Mr. Rush's statements regarding the propane tank.

We review the evidentiary rulings of a district court for abuse of discretion, "keeping in mind that its discretion is particularly broad in a conspiracy trial." United States v. Dierling, 131 F.3d 722, 730 (8th Cir. 1997). Fed. R. Evid. 801(d)(2)(E) provides that an out-of-court statement is not hearsay if it is offered against a party and is "a statement by a coconspirator of a party [made] during the course of and in furtherance of the conspiracy." The statement need not be made by one conspirator to another conspirator. United States v. Frazier, 280 F.3d 835, 848 (8th Cir. 2002). Instead, "[t]he relevant questions are (1) whether the *declarant*, and the *defendant* against whom the statements are offered, are members of the conspiracy, and (2) whether the *declarant* made the statements in the course of and in furtherance of the conspiracy." Ibid. Further, our Circuit has held that in order to satisfy the requirements of the Sixth Amendment's Confrontation Clause for the admission of a coconspirator's out-of-court statement, the offering party must demonstrate that the declarant is unavailable, and that the declarant's statement is reliable enough. United States v. DeLuna, 763 F.2d 897, 909-10 (8th Cir. 1985).

We believe Mr. Buttler's testimony regarding his brother's statements, explaining why he could not divulge the contents of his conversation with Mr. Manfre, has enough reliability to satisfy the Confrontation Clause. In essence, Mr.

-5-

Buttler testified that Mr. Rush refused to divulge what he and Mr. Manfre were discussing despite Mr. Buttler's suspicion. The statements concealing the contents of the conversation, which in light of subsequent events raised an inference of guilt, divulged no incriminating information at the time they were made. But, given the brother's suspicion and Mr. Rush's later attempts at concealment, we find that the likelihood that the statements were made and were truthful was sufficiently high to satisfy the Confrontation Clause. See id. at 910-11.[1] Further, we agree with the District Court that at the time Mr. Rush made the statements to Mr. Buttler a

[1]In the time since this case was submitted, the United States Supreme Court announced its decision in Crawford v. Washington, 124 S. Ct. 1354 (2004), a case of great importance. Crawford solidified three broad principles. First, it states that "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused." Id. at 1363. Second, it holds that the Confrontation Clause bars the introduction of "testimonial statements" of a witness who did not appear at trial, and whom the defendant did not have the opportunity to cross-examine. Id. at 1365. Third, it confirms that the residual body of our Confrontation Clause jurisprudence, unchanged by either of the first two principles, remains in effect. See id. at 1374. The Court in Crawford specifically left ambiguous the definition of "testimonial" but did not leave us without some bench marks. Ibid. First, the Court instructs that "an accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." Id. at 1364. Second, the Court cites Justice Thomas's concurrence in White v. Illinois, 502 U.S. 346 (1992), as instructive as to the definition of "testimonial." Crawford, 124 S. Ct. at 1374. In White, Justice Thomas explains that "the Confrontation Clause is implicated by extrajudicial statements only insofar as they are contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions." White, 502 U.S. at 365 (Thomas, J., concurring). Lastly, the Court in Crawford seems directly concerned with repudiating the reliability test of Ohio v. Roberts, 448 U.S. 56 (1980), a case involving the introduction of preliminary-hearing testimony of an unavailable witness against the defendant at trial. Given these clues, we believe that Crawford has no effect on our decision. Mr. Rush's comments were made to loved ones or acquaintances and are not the kind of memorialized, judicial- process-created evidence of which Crawford speaks.

conspiracy existed, and that at the time of trial, Mr. Rush was unavailable due to his death. Thus, the question remaining is whether the statements were made in furtherance of the conspiracy.

In explaining the "in furtherance of the conspiracy" component of the rule, we have held that "[a] statement that simply informs a listener of the declarant's criminal activities is not made in furtherance of the conspiracy; instead, the statement must 'somehow advance the objective of the conspiracy.' " United States v. Mitchell, 31 F.3d 628, 632 (8th Cir. 1994). That said, we interpret the phrase "in furtherance of" broadly. United States v. Gjerde, 110 F.3d 595, 603 (8th Cir. 1997). Thus, "[e]fforts to conceal an ongoing conspiracy . . . can further the conspiracy by assuring that the conspirators will not be revealed and the conspiracy brought to an end." United States v. Phillips, 219 F.3d 404, 419 (5th Cir. 2000). A statement of a conspirator which conceals the conspiracy without revealing any of the conspirators' illegal objectives from one who appears suspicious is in furtherance of the conspiracy and thus would be admissible under Rule 801(d)(2)(E). Mr. Rush's statement that he would not disclose the nature of his conversations with Mr. Manfre was an act of concealment that furthered the conspiracy by keeping it secret. Therefore, Mr. Buttler's testimony was admissible under Rule 801(d)(2)(E).

We turn now to Mr. Buttler's testimony that he overheard Mr. Rush discuss a propane tank with Mr. Manfre and Mr. Buttler's testimony that Mr. Rush claimed that he and Mr. Manfre were discussing possible promotional activities for the nightclub. The District Court admitted the statements under Rule 801(d)(2)(E), and while we agree in part, we feel that further discussion is required.

The admission of Mr. Buttler's testimony that he overheard Mr. Rush say "propane tank" did not involve a hearsay use of Mr. Rush's words. Rather, the fact that the words were uttered, a fact of which the witness had personal knowledge, is a fact in its own light from which an inference can be drawn connecting Mr. Rush and

Mr. Manfre with a propane tank found at the scene of the nightclub explosion. This is an example of a so-called "verbal act," a perhaps abused but still useful expression. "The hearsay rule excludes out-of-court assertions used to prove the truth of the facts asserted in them. Verbal acts, however, are not hearsay because they are not assertions and not adduced to prove the truth of the matter." Mueller v. Abdnor, 972 F.2d 931, 937 (8th Cir. 1992). The relevant fact, admissible in evidence without regard to Rule 801(d)(3)(E), is that Mr. Rush made the statement in question.

The harder issue is the admission of Mr. Buttler's restatement of Mr. Rush's explanation for discussing the propane tank with Mr. Manfre. The District Court admitted Mr. Buttler's testimony under Rule 801(d)(2)(E), and that ruling was not an abuse of discretion. One of the factors we look at in determining the reliability of a coconspirator statement is the content of the statement, and whether it was "corroborated by independent evidence." DeLuna, 763 F.2d at 910-11. In other words, we look at whether the statement turned out to be correct. Here, the discussion of the "promotional barbeque" seems to us a veiled suggestion of what ultimately happened, and thus we are comfortable with its reliability.

In either case, the statement was clearly intended to keep the truth of Mr. Rush's and Mr. Manfre's ultimate plans from Mr. Buttler, and thus we agree that it was made in furtherance of the conspiracy.

B.

Mr. Manfre also objects to the introduction of some of the testimony of Scott Strozier. Mr. Strozier, who lived in Arkansas, was a friend of Mr. Rush. On April 4, 2001, during a return visit to Arkansas by Mr. Rush, Mr. Strozier made plans to meet with Mr. Rush. Mr. Rush was late by some three or four hours. When he finally arrived, Mr. Rush said that he had been talking with Mr. Manfre and could not say what they had been talking about, but that Mr. Strozier would learn later. The basis

on which the District Court admitted this testimony is not clear on the face of the record. It seems it was admitted either under the present-sense-impression exception to the hearsay rule, Fed. R. Evid. 803(1), or as a non-hearsay statement of a coconspirator under Fed. R. Evid. 801(d)(2)(E). We agree with the latter ruling, in part, but disagree with admission of this evidence under the present-sense-impression exception to the general bar on the admission of hearsay testimony.

Fed. R. Evid. 803(1) provides that "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter" is admissible hearsay. "The underlying rationale of the present sense impression exception is that substantial contemporaneity of event and statement minimizes unreliability due to [the declarant's] defective recollection or conscious fabrication." United States v. Blakey, 607 F.2d 779, 785 (7th Cir. 1979), and see also United States v. Beck, 122 F.3d 676, 681-82 (8th Cir. 1997). Here, too much time had passed between when Mr. Rush spoke with Mr. Manfre and when he spoke with Mr. Strozier to call the transaction a present-sense impression. At the very least, there was an intervening walk or drive between the time of the discussion with Mr. Manfre and the time when Mr. Rush spoke with Mr. Strozier. The present-sense-impression exception to the hearsay rule is rightfully limited to statements made while a declarant perceives an event or immediately thereafter, and we decline to expand it to cover a declarant's relatively recent memories. The opportunity for strategic modification undercuts the reliability that spontaneity insures.

While Mr. Strozier's testimony as to Mr. Rush's statements was not admissible as a present-sense impression, the testimony is admissible in part and inadmissible in part as non-hearsay statements of a coconspirator. The testimony was really two-fold. First, Mr. Strozier testified that Mr. Rush explained his tardiness was due to his conversations with Mr. Manfre. That statement was inadmissible hearsay. Although it was made by a coconspirator, Mr. Rush, we cannot say that the mere declaration that he was talking to Mr. Manfre advanced the conspiracy in any way. The

-9-

admission of that testimony, however, was harmless, as we are firmly convinced that the District Court's error had no, or only slight, influence on the jury. Mitchell, 31 F.3d at 632.

The second component of Mr. Strozier's testimony, Mr. Rush's disclosure that he could not disclose the contents of his conversation with Mr. Manfre but that Mr. Strozier would learn soon, is admissible as a statement of a coconspirator. As discussed in our analysis of Mr. Buttler's testimony, attempts at concealing the nature of the conspiracy from an inquisitive acquaintance, even if no disclosure of the conspiracy's illegal end occurs in the process, does further the conspiracy.

C.

Next, Mr. Manfre objects to the admission of the testimony of Jessica Van Gaalen, Mr. Rush's fiancée and the mother of his child. Mr. Manfre's objection is two-fold. First, he objects to the admission of Ms. Van Gaalen's testimony that, upon discovering Mr. Rush looking over blueprints of the nightclub, Mr. Rush told her that he was going to burn down the nightclub for Mr. Manfre. He argues that testimony was inadmissible hearsay. Second, Mr. Manfre argues that a letter to Ms. Van Gaalen, found in a hotel room that Mr. Rush rented the evening of the nightclub explosion, should not have been admitted, again claiming that the testimony was inadmissible hearsay. We disagree with both assertions. Ms. Van Gaalen's testimony that Mr. Rush told her that he was going to burn down the nightclub was hearsay. It did not advance the conspiracy and thus cannot be considered a coconspirator statement under Fed. R. Evid. 801(d)(2)(E). Despite the testimony being hearsay, however, we hold that the testimony was admissible under the hearsay exception for declarations against penal interest.

Fed. R. Evid. 804(b)(3) establishes an exception to the hearsay rule if the declarant is unavailable to testify at trial, and the declarant made:

[a] statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

See also Gjerde, 110 F.3d at 603. Being "unable to be present or to testify at the hearing because of death" fits within the definition of unavailability. Fed. R. Evid. 804(a)(4). In addition, the trustworthiness of the statement must be clearly indicated. Gjerde, 110 F.3d at 603.

In the case at bar, we find that the statement made by Mr. Rush concerning the blueprints and Mr. Manfre, clearly against his penal interest at the time it was made, was reliable and was corroborated by later events. Mr. Rush made the statement to his fiancée, and while a fiancée is not a wife, it is not unreasonable to read credibility and honesty into such a relationship, especially given that the statement was not made under a pending threat of prosecution. Also, later facts showed that Mr. Rush did in fact burn down the nightclub, adding more support to our finding of reliability.

Mr. Manfre further argues that even if the testimony were admissible as a statement against penal interest it should not have been admitted because such admission would violate the Confrontation Clause. He argues that in light of the plurality opinion in Lilly v. Virginia, 527 U.S. 116 (1999) (holding statements inculpating a defendant made by coconspirator to police after arrest for robbery are inadmissible as against penal interest on Confrontation Clause grounds), we must overturn the admission of Ms. Van Gaalen's testimony, because, he asserts, Lilly

-11-

established as a matter of constitutional law that an out-of-court statement against penal interest offered by a declarant accessory against the defendant never meets the requisite reliability standards of the Confrontation Clause. He argues that there is too great an incentive for the declarant to shift the blame, and that the Supreme Court barred the admission of such testimony in Lilly. We disagree.

As our analysis in United States v. Papajohn, 212 F.3d 1112, 1118-20 (8th Cir. 2000), shows, the context in which the statement is made is of significant import in determining the statement's reliability for Confrontation Clause purposes. This is true, in part, because "it can almost always be said that a statement made by a declarant that incriminates another person in a crime will make it less likely that the declarant will be charged for the crime. The extent to which this fact renders the declarant's statement untrustworthy is a matter of degree." Id. at 1119. Thus, the admission of a declarant's grand-jury testimony implicating the defendant satisfies Lilly and the Confrontation Clause, id. at 1120, but a declarant's statements implicating the defendant made while assisting the authorities in completing a controlled drug delivery, did not. United States v. Chapman, 345 F.3d 630, 634-635 (8th Cir. 2003). There is far less an incentive for someone not the target of a grand jury to lie than there is for a declarant who feels that he is in custody, or something like it, and may become the target of a criminal investigation. Given the context and content of Mr. Rush's statement, we believe that the admission of Ms. Van Gaalen's testimony satisfied Lilly and the Confrontation Clause.

As noted, Mr. Rush's statement to Ms. Van Gaalen was not made while facing trial, but was instead made casually to an intimate confidante in a setting that does not raise the same concerns as Lilly or Chapman. Further, Mr. Rush's statement evidences none of the "pass the buck" worry that controlled the plurality in Lilly. Instead, Mr. Rush took on the lion's share of responsibility. He explained that he was going to burn down the building for Mr. Manfre. Thus, Ms. Van Gaalen's testimony regarding Mr. Rush's statement about the blueprints was properly admitted.

-12-

The introduction of the letter left by Mr. Rush for Ms. Van Gaalen was also proper. The letter discusses his remorse and fear that something might happen to him in burning down the nightclub.[2] The letter, however, does not mention Mr. Manfre and thus raises no <u>Lilly</u> issues. It is relevant in that it demonstrates Mr. Rush's anticipation of completing the conspiracy, and thus is admissible as a statement against penal interest.

---

[2]The letter reads:

> Dear Jessica,
>
> If this reaches you before I do . . . then things went bad! I want you to know I never wanted to do this! I had no choice! If I hadn't of done it . . . then I would not only have endangered myself . . . but you and the baby as well! I was never threatened physically but the innuendos where there! Huh . . . if I was single this would be cake walk . . . but I have a family to think about now! But if we are to ever be ok or you are able to be completely left alone by them. . . then I have no choice but to silence myself and you have to do the same. . . no questions asked! No answers given, not even if I ask you! Nothing! Otherwise we, or I . . . am in danger! I'm so scared for you only. . . as for myself. . . the fears are there. . .but that's only the fact I'll never be there to hold you ever again! Muchless our baby! I'm so sorry I . . . I'm sorry! Please let the baby be part of my family. . . They'll love you more then anyone! Goodbye angel!
>
> Thank you for loving me!
>
> Sincerely, love,
> David L. Rush

-13-

D.

Lastly, Mr. Manfre objects to the admission of his friend Trevor Mills's testimony. At trial, Mr. Mills testified that he and Mr. Rush had discussed Mr. Rush's plans to burn down the nightclub. According to Mr. Mills, Mr. Rush told him that Mr. Manfre had hired him to burn down the nightclub as part of an insurance scam. Mr. Rush told Mr. Mills of the plan to use gasoline in the fire, his possession of the blueprints, and the eventual plan to split the insurance proceeds. Mr. Rush sought out these conversations with Mr. Mills, hoping to obtain guidance on whether he should go through with the plan.

Similar to our discussion of Ms. Van Gaalen's testimony, we believe this testimony was properly admitted as a statement against penal interest. The statements were not made in a setting where Mr. Rush had a major incentive to shift the blame to Mr. Manfre, and they were against Mr. Rush's penal interest at the time they were made. Thus, we see no Confrontation Clause problems and hold that the evidence was properly admitted.

III.

On appeal, Mr. Manfre also requests that we review certain documents placed under seal by the District Court to determine if he was entitled to any of the material under the Jencks Act or under Brady v. Maryland, 373 U.S. 83 (1963). In particular, Mr. Manfre asked us to review the documents "for anything which would impeach four witnesses – Buttler, Strozier, Van Gaalen or Mills – or material which would have pointed toward culpability of the [nightclub] co-owner John Moore and tending to exonerate [him]." Opening Brief of Appellee at 66. After a review of the documents, we have found no material that tended to exonerate Mr. Manfre.

Our review for Jencks material was made significantly harder by Mr. Manfre's failure to tell us what he had previously received from the government. While there were some signed statements of witnesses in the file which would qualify as Jencks material under 18 U.S.C. § 3500(e), we were unable to tell whether those statements had been disclosed. According to the government (not controverted by the defendant), the statement of Mr. Strozier, the only qualifying material we found of one of the four witnesses Mr. Manfre noted, had been disclosed. The rest of the statements were from minor witnesses and were consistent with the trial testimony they gave. We are unsure whether they were disclosed. However, to the extent that they were not disclosed, there was no prejudice to the defendant, and we find no bad faith on the part of the government. United States v. Douglas, 964 F.2d 738, 741-42 (8th Cir. 1992).

IV.

Both Mr. Manfre and the government appeal from the sentence imposed. Mr. Manfre argues that he should have received a downward departure under United States Sentencing Guidelines § 5K2.10. The government argues that the District Court began with the wrong base-offense level and that it erred in not imposing an obstruction-of-justice enhancement. Purely for organizational convenience, we address the government's appeal first.

A.

In calculating Mr. Manfre's sentence on the arson charge, the District Court began with § 2K1.4 of the United States Sentencing Guidelines. Section 2K1.4(c)(1) provides:

> If death resulted, or the offense was intended to cause death or serious bodily injury, apply the most analogous guideline from

-15-

Chapter Two, Part A (Offenses Against the Person) if the resulting offense level is greater than that determined above.

Cross-referencing and applying our decision in United States v. Ryan, 9 F.3d 660, 671-72 (8th Cir. 1993), the District Court determined that § 2A1.1, First Degree Murder, was the most "analogous guideline." The dispute on appeal concerns the downward departure the District Court granted from the First Degree Murder base-offense level of 43 to 33 – the same base-offense level as § 2A1.2, Second Degree Murder. The government supported a departure from 43 to 38 but objected to any lower departure. The argument is renewed here.

"Under the PROTECT Act, we review de novo the application of the guidelines to the facts and review the district court's factual findings for clear error." United States v. Willey, 350 F.3d 736, 738 (8th Cir. 2003) (internal citations omitted). We affirm.

In relevant part, Note One of the Commentary to § 2A1.1 provides:

> [i]f the defendant did not cause the death intentionally or knowingly, a downward departure may be warranted. The extent of the departure should be based upon the defendant's state of mind (e.g., recklessness or negligence), the degree of risk inherent in the conduct, and the nature of the underlying offense conduct. However, the Commission does not envision that departure below that specified in § 2A1.2 (Second Degree Murder) is likely to be appropriate.

At the sentencing hearing, the District Court explained that it had "rel[ied] upon the fact that . . . [it] did not believe [Mr. Rush's] death was intentionally or knowingly

caused by [Mr. Manfre]. [Mr. Manfre's] state of mind was such that I don't think he intended that to happen." Sentencing Tr. 22. We believe that these factual findings by the District Court were not clearly erroneous, and thus the departure was warranted.

The Commentary gives broad discretion to the District Court to determine the extent of the departure between first-degree murder and second-degree murder, and as long as the District Court finds sufficient facts we will not disturb the departure despite our de novo review. The District Court's application of the Guidelines in this case was based both on facts it explicitly found and on facts it impliedly found as the presider and participant in Mr. Manfre's trial. The ten-level departure connotes the District Court's belief that Mr. Manfre's responsibility for Mr. Rush's death was peripheral, that this was a botched insurance scam with a tragic result – both of which are factual findings. We agree, after a de novo review of the application of these facts to § 2A1.1 of the Guidelines, that a ten-level departure was warranted in this case.

B.

We turn now to the government's second issue. It argues that the District Court erred in not imposing a two-level enhancement for obstruction of justice under § 3C1.1. The government asserts that Mr. Manfre made false or inconsistent statements to law enforcement officials concerning: (a) the monitoring of the nightclub security system, (b) Mr. Manfre's relationship with Mr. Rush, (c) why Mr. Rush had copies of the blueprints for the nightclub, (d) whether there were gas cans in Mr. Manfre's truck the evening of April 23, and (e) Mr. Manfre's assertion to investigators that he was current on his loan payments for the nightclub.

Recently, our Court reaffirmed its position that "once the district court has found the facts that trigger application of the [obstruction-of-justice] adjustment, the court must apply the adjustment." United States v. Bush, 352 F.3d 1177, 1185 (8th

Cir. 2003), and see, e.g., Hall v. United States, 46 F.3d 855, 859 (8th Cir. 1995) ("If Hall in fact threatened the witness, the Guidelines did not give the district court discretion to refuse to take the threat into account in sentencing . . . the district court had no choice but to impose the sentence enhancement that the Guidelines mandate."). The Guidelines describe the conduct which gives rise to the enhancement as the defendant's "obstruct[ion] or imped[ing], or attempt[ing] to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction." United States Sentencing Guidelines § 3C1.1.

We believe the District Court found that Mr. Manfre had obstructed, or at least attempted to obstruct, the investigation into the nightclub explosion, and thus was obligated to impose the enhancement. In questioning the government at the sentencing hearing, the District Court asked the government:

> THE COURT: How much trouble was that for the government to determine that he was 14 months behind or whatever?
>
> ANSWER: It wasn't hard for us to determine and my point is that obstruction doesn't have to be successful.
>
> THE COURT: Well, and it was not very successful in this case, was it? Looks like his efforts – his efforts at best can be, you know, described as not very good or not very successful.

Sentencing Tr. 31. The Court's line of questioning demonstrates its implied finding that Mr. Manfre had attempted to obstruct the investigation into the explosion, but that he was unsuccessful. This appears to have been the reason for the Court's decision not to impose the enhancement. Since § 3C1.1 punishes attempt as well as successful obstruction, the enhancement should have been given.

C.

Finally, we turn now to Mr. Manfre's contention that he should have received a downward departure under § 5K2.10, Victim's Conduct. The gist of Mr. Manfre's argument is that because his sentence was determined by reference to homicide guideline § 2A1.1, he should have been given a downward departure for Mr. Rush's role in bringing about his own death. Section 5K2.10 provides, in pertinent part, that "if the victim's wrongful conduct contributed significantly to provoking the offense behavior, the court may reduce the sentence below the guideline range to reflect the nature and circumstance of the offense." The issue on appeal is whether Mr. Rush was, in fact, a "victim." Mr. Manfre contends that he was; the District Court held that he was not.

Mr. Manfre argues that United States v. Drapeau, 188 F.3d 987 (8th Cir. 1999), supports his position. In Drapeau, we held under a different Guideline that a police officer was a "victim" of the defendant's crime, unlawfully making and possessing a firearm, when the defendant had made firebombs for the express purpose of "getting" the officer. Id. at 990-91. We reasoned that "[t]he aim or purpose of making the firebomb. . . was to 'get' [the officer]. Thus, within the plain and ordinary meaning of the term 'victim,' the person who is the object[, or purpose of,] [the defendant's] crime of unlawfully making a firearm is [the officer]." Id. at 991 (internal quotations omitted). Applying that same reasoning to our case, we look to what the charged offense was, and whether Mr. Rush was the target of that offense to determine whether he was a "victim." We believe that the District Court correctly denied the downward departure.

Mr. Manfre was convicted of arson. The target of that offense was the insurance company from whom he hoped to collect on a fraudulent claim. Mr. Rush was not a victim; he was a coconspirator who tragically died in the process of completing the crime. Mr. Manfre's argument that he must get the downward

departure because he was charged under a homicide guideline is simply incorrect. Mr. Manfre was sentenced under § 2K1.4, Arson. The fact that the guideline directs the sentencing court to apply the most analogous guideline from "Chapter Two, Part A (Offenses Against the Person)" does not change the fact that Mr. Manfre was punished for arson, and that the "victim" is determined by looking to the target of the arson, not the cross-referenced guideline. United States Sentencing Guideline § 2K1.4(c)(1).

## V.

In sum, we affirm. Mr. Manfre's evidentiary objections were, for the most part, correctly overruled at trial. The few evidentiary errors that were made were harmless. Mr. Manfre's appeal from the denial of a downward departure under § 5K2.10 is without merit. The government's cross-appeal from the District Court's determination of the base offense level is without merit. The government's challenge to the District Court's failure to impose the obstruction-of-justice enhancement is upheld. The sentence is vacated, and the case remanded to the District Court for resentencing consistent with this opinion.

_____