The STATE of Ohio, Appellant,

v.

RAY, Appellee.

[Cite as *State v. Ray*, 189 Ohio App.3d 292, 2010-Ohio-2348.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 93435.

Decided May 27, 2010.

Thompson Hine, L.L.P., and John R. Mitchell; and Timothy B. Miller, for appellant.

Michael P. Shaughnessy; Robert L. Tobik, Cuyahoga County Public Defender, and Erika B. Cunliffe, Assistant Public Defender; David McGee; John P. Parker; and John Stanard, for appellee.

ANN DYKE, Judge.

{¶ 1} Appellant, the state of Ohio, appeals the trial court's denial of its motion to admit victim's statements and the trial court's granting of the motion of defendant-appellee, Thomas J. Ray ("appellee"), to exclude statements of the victim. For the reasons that follow, we affirm in part and reverse in part, and remand to the trial court for proceedings consistent with this opinion.

{¶ 2} During the evening of January 5, 2008, Robert Crutchfield, a U.S. Marine recently home following a tour in Iraq, was waiting for a bus at 7118 Superior Avenue in Cleveland, Ohio with his girlfriend, Aminah Menefee, when two males robbed him and shot him in the neck. Bleeding and unconscious, he was rushed to Cleveland's MetroHealth Medical Center and underwent emergency surgery. Dr. Charles Yowler, the Director of MetroHealth's Trauma, Critical Care and Burns Division, along with a number of other surgeons, repaired Crutchfield's neck, including his carotid artery. Crutchfield survived this surgery, but the following day, he suffered a massive stroke resulting in paralysis to his left side, as well as severe swelling to his brain. As a result, Crutchfield underwent another life-saving surgery, in which Dr. Roseanna Lechner removed half of his skull to relieve the pressure to his brain.

{¶ 3} Following these surgeries, Crutchfield's physical health progressed slowly, but persistently, and he was eventually released from the hospital to St. Augustine for rehabilitation. There, he was able to regain partial use of his left side and the ability to walk. On April 15, 2008, he also underwent a third surgery to replace the previously removed portion of his skull. Unfortunately, although Crutchfield seemed to be recovering, he ultimately died on May 18, 2008, from meningitis.

{¶ 4} On June 26, 2008, the Cuyahoga County Grand Jury indicted appellee on 13 counts in connection with this matter: counts 1 and 2 alleged aggravated murder with both counts including six felony-murder specifications; counts 3 and 4 alleged kidnapping; counts 5 and 6 alleged aggravated robbery; counts 7 and 8

alleged felonious assault; counts 9 through 12 alleged murder; and count 13 alleged having a weapon while under disability. Counts 1 through 12 also included one- and three-year firearm specifications. Appellee pleaded not guilty to all charges.

{¶ 5} On March 23, 2009, the state filed a motion to admit the victim's statements. Appellee filed a competing motion to exclude the statements of the victim on April 23, 2009. On May 11, 2009, the trial court commenced a hearing concerning these motions. During this hearing, the state presented testimony from the following individuals: Dr. Roseanna Lechner, Crutchfield's neurological surgeon from MetroHealth Medical Center; Alberta Holt, Crutchfield's aunt; Detective Leroy·Gilbert with the Cleveland Police Department; Dr. Charles Yowler, the Director of MetroHealth's Trauma, Critical Care and Burns Division and Crutchfield's surgeon; Janeen Thomas, Crutchfield's sister; and Aminah Menefee, Crutchfield's girlfriend, who was present the night of the shooting. At the hearing, Dr. Werner Spitz, a forensic pathologist, also testified on behalf of the defense.

{¶ 6} At the hearing, Dr. Lechner testified about Crutchfield's brain injury, the craniectomy needed to save his life, and the progress following surgery. She stated that after surgery, Crutchfield was still in a "very serious condition." She further stated that upon regaining consciousness, he would find that he underwent a decompressive craniectomy, suffered from paralysis on the left side, was mechanically ventilated, had a feeding tube through his abdominal wall, had a catheter in his ureter, and had to use a bed pan. Finally, she briefly explained that his third surgery, on April 25, 2008, replaced the skull that was previously removed.

{¶ 7} Alberta Holt, Crutchfield's aunt, testified that he had remained unconscious for several days following the initial surgeries. Within a week or two of the shooting, he became responsive by initially making hand gestures and eventually writing in a note pad. She testified that he wrote that the assailant's name was "Spider" and that he was a "boy at my school." Additionally, when he was able to talk, he informed Holt that Spider had demanded his money and then shot him. He further provided that he did not know the other male involved in the shooting and when asked if the two men had taken any money from Crutchfield, he would reply: "I only had eight dollars."

{¶ 8} As is relevant to this appeal, Detective Gilbert, the lead detective on this case, testified at the hearing that he prepared and presented a photo lineup in which Crutchfield, on January 22, 2008, identified appellee as his assailant. He further provided that on April 12, 2008, Crutchfield provided him with a statement, which the detective reduced to writing.

{¶ 9} Dr. Charles Yowler testified that he was one of the many surgeons who repaired Crutchfield's neck on January 5, 2008. He further stated that as a result of the surgeries to his neck and brain, Crutchfield had a 50 to 70 percent chance of dying during his entire period of hospitalization. In other words, the doctor opined that from January 5, 2008, until May 18, 2008, Crutchfield was at risk of death on each and every day. Finally, Dr. Yowler confirmed that upon regaining consciousness from his first two surgeries, the 22–year–old awoke to find himself paralyzed on one side of his body, on a ventilator, unable to speak, and with a hole in his neck. Accordingly, the doctor opined, it would not be unreasonable for him to think he was dying.

{¶ 10} Crutchfield's older sister, Janeen Thomas, testified at the hearing that he did not regain consciousness until approximately one week following the shooting. At that initial time of wakefulness, Crutchfield could not speak and the two only held hands. The following day, however, without any questioning or prompting, he moved his fingers, making a "finger crawling" gesture that he repeated several times. At the time, Janeen did not understand the meaning of this gesture. At a later date, however, she learned that "Spider" was the street name of Crutchfield's assailant and that he knew Spider from school.

{¶ 11} Aminah Menefee, Crutchfield's girlfriend, testified that she was present at the robbery and shooting. She provided details of the incident and stated that about one week following the surgery to his brain, Crutchfield regained consciousness for the first time but was only able to squeeze her hand and give the "thumbs up" sign. The following day, however, he made the finger-crawling gesture indicating a spider, although he could not talk or write. Furthermore, at a later date, Crutchfield wrote the word "spider" in his notebook and told Aminah that he knew Spider from school. Crutchfield further informed her that during the incident, he told the shooters that he did not have any money and that they "might as well kill [him]."

{¶ 12} Dr. Spitz testified at the hearing on behalf of the defense and provided that he was a medical examiner for Wayne County in Michigan, as well as a forensic pathologist. Although he never examined Crutchfield personally, he reviewed all his medical records and opined that Crutchfield was stabilized by the third week in January. At this time, he was alert and able to maintain excellent eye contact. Spitz further stated that the medical records indicated that Crutchfield wanted to live and was not in a depressive state because, on March 25, 2008, he asked for full resuscitation CPR should the need arise. Spitz also noted that at this time, Crutchfield was ambulatory.

{¶ 13} Finally, Dr. Spitz acknowledged and agreed with Dr. Yowler that upon regaining consciousness from the first two surgeries, Crutchfield would have believed he had suffered an injury that would lead to his death. He testified that

Crutchfield would have awakened to a very different reality, in which he was paralyzed on his left side, had received a tracheotomy, was being mechanically ventilated, had a surgical feeding tube inserted through his abdominal wall and a catheter in his ureter, and was defecating on the sheets of his bed.

{¶ 14} Following presentation of the aforementioned testimony, the trial court rendered inadmissible all the following statements, as outlined by the court in its judgment entry, made by Crutchfield prior to his death but before the defense had the opportunity to cross-examine him (hereinafter referred to as "statements (a) through (i)"):

{¶ 15} "a.  Hand movements made in the presence of the victim's sister, Janeen Thomas, which she interpreted as indicating a spider — that being defendant Ray's street name;

{¶ 16} "b.  A statement made to Janeen Thomas that described one of the shooters as a 'guy with braids' whom he had known in school several years earlier;

{¶ 17} "c.  Statements by the victim to the defendants, that: 'I have nothing else, you will have to kill me,' and a response by one of the defendants, upon examining the victim's military identification, that: 'You are a marine, you don't deserve to live';

{¶ 18} "d.  A statement by the victim to his aunt, Alberta Holt, that he had been shot by 'Spider' and that the two had attended East High School together;

{¶ 19} "e.  A statement to Alberta Holt that Spider had demanded his money, then shot him.  Crutchfield told her 'I don't know the other guy.'  When asked if they had taken any money from him, Crutchfield replied: 'I only had eight dollars';

{¶ 20} "f.  A statement from Crutchfield's girlfriend, Aminah Menefee, who was with him at the time of the incident.  She testified at the hearing that Crutchfield wrote the word 'spider' and made hand gestures indicating a spider's movements, and that he told her he knew Spider from school;

{¶ 21} "g.  A statement from Aminah Menefee that the victim told 'the defendants' [sic] that he did not have any money and that they 'might as well kill me';

{¶ 22} "h.  Identification by Crutchfield of defendant Ray from a photo array presented by Det. Gilbert on January 22, 2008;

{¶ 23} "i.  A statement given by Crutchfield to Det. Gilbert on April 12, 2008."

{¶ 24} In response to the trial court's judgment, the state filed this interlocutory appeal and now presents two assignments of error for our review.  In the

interests of convenience, we will address both simultaneously. The state's first assignment provides:

{¶ 25} "The trial court abused its discretion when it ruled that Mr. Crutchfield's statements identifying Thomas Ray as the individual who shot him in the neck were not dying declarations that are admissible pursuant to *Crawford v. Washington* (2004), 541 U.S. 36[, 124 S.Ct. 1354, 158 L.Ed.2d 177] and Ohio Rule of Evidence 804(B)(2)."

{¶ 26} Its second assignment of error states:

{¶ 27} "The trial court abused its discretion when it ruled that some of Mr. Crutchfield's statements identifying Thomas Ray as the individual who shot him in the neck were not excited utterances that are admissible pursuant to *Crawford v. Washington* (2004), 541 U.S. 36[, 124 S.Ct. 1354, 158 L.Ed.2d 177] and Ohio Rule of Evidence 803(2)."

{¶ 28} In these assignments of error, the state argues that the trial court erred in failing to allow the admission of statements (a) through (i), which were made prior to Crutchfield's death but before the defense had an opportunity to cross-examine him. In considering the state's arguments, we must first determine whether the admission of any of the statements would violate appellee's Sixth Amendment right of confrontation. In so deciding, we keep in mind that we review a lower court's ruling concerning the admission of evidence under an abuse-of-discretion standard. *State v. Duncan* (1978), 53 Ohio St.2d 215, 219, 7 O.O.3d 380, 373 N.E.2d 1234.

## I. CONFRONTATION CLAUSE

{¶ 29} The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." The United States Supreme Court in *Crawford v. Washington* (2004), 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177, held that the Confrontation Clause bars admission of "testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." Id. at 53–54.

{¶ 30} "In *Crawford* * * *, the United States Supreme Court substantially altered prior case law, including the seminal case of *Ohio v. Roberts* [(1980), 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597] that had generally permitted under the Confrontation Clause hearsay exceptions based upon unavailability provided that the statements bore significant indicia of reliability. After a [sic] exhaustive historical analysis of common-law antecedents, including the trial of Sir Walter Raleigh, the Court concluded that the Confrontation Clause, as intended by the Founding Fathers, was specifically designed to prohibit the

state's use of 'testimonial' statements by the unavailable declarant when those 'testimonial' statements were obtained as the result of *ex parte* examinations without the opportunity for cross-examination by the defendant. 541 U.S. at [42–60], 124 S.Ct. at 1359–1370[, 158 L.Ed.2d 177]. When the hearsay is 'testimonial' in nature—i.e., the result of official examination—the Court held that such hearsay is inadmissible, regardless of its reliability and regardless of the declarant's unavailability, unless the defendant has had a prior opportunity to cross-examine. Id." (Footnotes omitted.) *State v. Nix,* Hamilton App. No. C–030696, 2004-Ohio-5502, 2004 WL 2315035, at ¶ 73.

{¶ 31} Thus, according to *Crawford,* the initial analysis to be made in determining whether a defendant's right to confrontation has been violated by the admission of out-of-court statements that are not subject to cross-examination "is not whether [the statements] are reliable but whether they are testimonial in nature." *Toledo v. Sailes,* 180 Ohio App.3d 56, 2008-Ohio-6400, 904 N.E.2d 543, at ¶ 13, citing *Crawford,* 541 U.S. at 61, 124 S.Ct. 1354, 158 L.Ed.2d 177.

{¶ 32} To determine whether a statement is "testimonial," the court in *Crawford* did not precisely define the term, but listed the following examples: (1) ex parte in-court testimony or its functional equivalent, such as affidavits and prior testimony that the defendant was unable to cross-examine, or pretrial statements that declarants would reasonably expect to be used in a prosecution, (2) extra-judicial statements contained in formal testimonial materials such as depositions, prior testimony, or confessions, and (3) statements made under circumstances that would lead an objective witness to believe that the statement would be available for use at a later trial. Id.

{¶ 33} Later, in *Davis v. Washington* (2006), 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224, the court further considered the meaning of "testimonial" and held:

{¶ 34} "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." Id. at 822, 126 S.Ct. 2266, 165 L.Ed.2d 224.

{¶ 35} Finally, to determine whether a statement is testimonial or nontestimonial, we inquire "whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime." *United States v. Cromer* (C.A.6, 2004), 389 F.3d 662, 675; see also *State v. Stahl,* 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, at paragraph two of the syllabus.

### A.   Statements (h) and (i)

■ {¶ 36} In this case, statements (h) and (i), Crutchfield's identification of his assailant from a photo array and his statement to Det. Gilbert, are undoubtedly testimonial and thus subject to the Confrontation Clause.   These statements were taken in the course of police questioning, when there was no emergency, and their primary purpose was to establish or prove past events potentially relevant to later prosecution.   *Davis* at 822, 126 S.Ct. 2266, 165 L.Ed.2d 224. Therefore, after carefully reviewing statements (h) and (i) under the legal standards provided in *Crawford*, *Davis*, and *Cromer*, we find them, on their face, testimonial and subject to the Confrontation Clause.

### Dying Declaration under the Confrontation Clause

■ {¶ 37} While testimonial statements under *Crawford* are not subject to the exceptions to the hearsay rules, they may nevertheless be admissible under one of the two historical exceptions to the Confrontation Clause recognized by the U.S. Supreme Court—forfeiture by wrongdoing and dying declarations.   See *Giles v. California* (2008), 554 U.S. 353, 128 S.Ct. 2678, 2683, 171 L.Ed.2d 488; *Crawford*, 541 U.S. at 56, 62, 124 S.Ct. 1354, 158 L.Ed.2d 177, fn. 6.   In this appeal, the state argues only that Crutchfield's photo identification of appellee and his statement to Det. Gilbert are dying declarations and thus do not implicate *Crawford*.[1]   We proceed to consider the state's argument in this regard.

{¶ 38} In *State v. Duncan*, Cuyahoga App. No. 87220, 2006-Ohio-5009, 2006 WL 2777586, we considered for the first time whether a dying declaration can be admissible considering the principles outlined in *Crawford*.   We recognized that *Crawford* provided, in dictum, that " 'we need not decide in this case whether the Sixth Amendment incorporates an exception for testimonial dying declarations. If this exception must be accepted on historical grounds, it is *sui generis*.' "   Id. at ¶ 22, quoting *Crawford*, 541 U.S. at 56, 124 S.Ct. 1354, 158 L.Ed.2d 177, fn. 6. Accordingly, we held that a dying declaration does not implicate *Crawford*. *Duncan* at ¶ 23.   Two years later in *Giles*, the United States Supreme Court confirmed that a dying declaration is a historical exception to the Confrontation Clause.

---

1.  In this matter, the trial court rejected the state's contention that the rule of forfeiture by wrongdoing applies in this case.   In *Crawford*, the court acknowledged that this exception still applies even to testimonial statements.   *Crawford*, 541 U.S. at 62, 124 S.Ct. 1354, 158 L.Ed.2d 177.   We decline to analyze this exception on appeal because the state seems to concede this point by not challenging the court's ruling in this regard.   Nevertheless, were we to address the rule of forfeiture by wrongdoing, we would affirm the trial court's judgment for the same reasons offered in its judgment entry filed on June 3, 2009.

{¶ 39} Our analysis then turns to whether the testimonial statements by Crutchfield to Det. Gilbert, statements (h) and (i), constitute dying declarations. Evid.R. 804(B)(2) defines a dying declaration or a statement under belief of impending death as "a statement made by a declarant while believing that his or her death was imminent, concerning the cause or circumstances of what the declarant believed to be his or her impending death."

{¶ 40} The Supreme Court of Ohio has stated, "It is essential to the admissibility of dying declarations as evidence, that it should be made to appear to the court, by preliminary evidence, not only that they were made in articulo mortis (at the point of death), but also made under a sense of impending death, which excluded from the mind of the dying person all hope or expectation of recovery." *Robbins v. State* (1857), 8 Ohio St. 131.

{¶ 41} In this case, the trial court focused on whether a reasonable person in Crutchfield's position would believe that his death was impending and concluded that statements (h) and (i) were not dying declarations. The court relied on the fact that Crutchfield's physical health continued to improve from January until he passed away in May from the onset of meningitis. Accordingly, the court determined that at the time Crutchfield provided statements (h) and (i), during late January and mid-April, he could not possibly have believed that his death was impending.

{¶ 42} Without addressing whether the trial court's factual findings in this regard are reasonable, we instead find statements (h) and (i) not dying declarations because they were not made "in articulo mortis (at the point of death)." *Robbins* at 131. In this instance, the record demonstrates that Crutchfield made statements (h) and (i) in January and April, respectively. He, however, did not pass away from meningitis until May 28, 2008. During this extended period of time, he was conscious, aware of his surroundings, communicating, and at times even ambulatory, with a brief return home. Thus, we do not believe that Crutchfield's delayed death in this case was the type contemplated when the courts created the historical dying-declaration exception. Therefore, we agree with the trial court that statements (h) and (i) do not constitute dying declarations, but reach this conclusion for different reasons. Accordingly, we conclude that statements (h) and (i) are testimonial statements that fall within the parameters of *Crawford*, and thus, are inadmissible.

### B. Statements (a) through (g)

{¶ 43} With regard to statements (a) through (g), we find these statements nontestimonial in nature, and thus, they are not barred by the Confrontation Clause. Crutchfield made these gestures and statements to Alberta Holt, Janeen Thomas, and Aminah Menefee. None of these individuals are law-

enforcement personnel, and the statements "were not the result of any official examination." *Nix*, 2004-Ohio-5502, 2004 WL 2315035, at ¶ 75. Additionally, Crutchfield's primary purpose in telling his friends and family was not to aid in the prosecution or the result of an interrogation, but rather to speak of the events with his kin. See *United States v. Manfre* (C.A.8, 2004), 368 F.3d 832, 838, fn. 1 ("Mr. Rush's comments were made to loved ones or acquaintances and are not the kind of memorialized, judicial-process-created evidence of which *Crawford* speaks").

■ {¶ 44} Although we have determined that Crutchfield's statements to friends and family are nontestimonial in nature and not subject to the confines of the Confrontation Clause, we must nevertheless proceed to determine their admissibility under the rule of *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597. See *Crawford*, 541 U.S. at 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (reasoning that "[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as does *Roberts*, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether"); *State v. Braun*, Cuyahoga App. No. 91131, 2009-Ohio-4875, 2009 WL 2963759, at ¶ 117; *State v. McCree*, Cuyahoga App. No. 87951, 2007-Ohio-268, 2007 WL 178933, at ¶ 57. Pursuant to *Roberts*, an out-of-court statement may be admissible even if the declarant is unavailable for cross-examination if we find that the statement falls "within a firmly rooted hearsay exception" or bears adequate indicia of reliability. *Roberts*, 448 U.S. at 66, 100 S.Ct. 2531, 65 L.Ed.2d 597; *Braun*, 2009-Ohio-4875, 2009 WL 2963759.

{¶ 45} One firmly established exception to the hearsay rule is a dying declaration, previously discussed in this opinion. *Roberts* at 66, 100 S.Ct. 2531, 65 L.Ed.2d 597, fn. 8. Another such exception is an excited utterance. *State v. Richardson*, Lucas App. No. L–07–1214, 2010-Ohio-471, 2010 WL 497343, at ¶ 61. We proceed to consider these exceptions in analyzing the nontestimonial statements in (a) through (g).

### Dying Declaration as a Hearsay Exception

■ {¶ 46} Keeping in mind the law previously discussed in regard to dying declarations, we find that Crutchfield's statements in (a) through (g) do not constitute dying declarations. None of these statements were made "in articulo mortis" or at the point of death. In fact, the most recent and last statement to Aminah Menefee was made weeks before Crutchfield passed away and before he contracted meningitis. Accordingly, we find that the state's argument in this regard is without merit.

*Excited Utterance as a Hearsay Exception*

{¶ 47} The state also argues that Crutchfield's nontestimonial statements in (a) through (g) constitute excited utterances under Evid.R. 803(2). An "excited utterance" is defined as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Evid.R. 803(2).

{¶ 48} For an alleged excited utterance to be admissible, four prerequisites must be satisfied: (1) a startling event produced a nervous excitement in the declarant, (2) the statement was made while still under the stress of excitement caused by the event, (3) the statement related to the startling event, and (4) the declarant personally observed the startling event. See *State v. Brown* (1996), 112 Ohio App.3d 583, 601, 679 N.E.2d 361.

{¶ 49} While the passage of time between the event and the declaration is relevant, it is not dispositive of the issue. *State v. Taylor* (1993), 66 Ohio St.3d 295, 303, 612 N.E.2d 316. The Ohio Supreme Court has made clear that to be an excited utterance, the statement need not be strictly contemporaneous with the startling event. *State v. Duncan* (1978), 53 Ohio St.2d 215, 7 O.O.3d 380, 373 N.E.2d 1234. " '[E]ach case must be decided on its own circumstances, since it is patently futile to attempt to formulate an inelastic rule delimiting the time limits within which an oral utterance must be made in order that it be termed a spontaneous exclamation.' " *Taylor* at 303, quoting *Duncan* at 219–220. Rather, we consider whether the declarant is still under the stress of the event or whether the statement was the result of reflective thought. Id. See also *In re C.C.*, Cuyahoga App. Nos. 88320 and 88321, 2007-Ohio-2226, 2007 WL 1366431 (finding an excited utterance even though 27 days had passed between the event and the statement); *State v. Duke* (Aug. 25, 1988), Cuyahoga App. No. 52604, 1988 WL 88862 (finding an excited utterance when the statement was made ten days following an incident).

{¶ 50} Furthermore, many courts, including the Supreme Court of Ohio, have recognized that a gesture constitutes an utterance for purposes of determining whether a statement constitutes an excited utterance. *State v. Simko* (1994), 71 Ohio St.3d 483, 490, 644 N.E.2d 345 (victim's nodding of head in response to officer's questions because she was unable to speak due to intubation constituted excited utterance); *In re Bright,* Trumbull App. Nos. 2001–T–0095 and 2001–T–0097, 2003-Ohio-2835, 2003 WL 21267810 (pointing or nodding in response to mother's questions determined to be excited utterances).

{¶ 51} The 1980 Staff Note to Evid.R. 803(2) explains as follows:

{¶ 52} "It is a statement or act incidental to a main fact and explanatory of it, provided it is so connected with the transaction as a whole that the utterance or

act is regarded as an expression of the circumstances under which it was made rather than the narrative result of thought. To qualify as an excited utterance consideration must be given to (a) the lapse of time between the event and the declaration, (b) the mental and physical condition of the declarant, (c) the nature of the statement and (d) the influence of intervening circumstances.

{¶ 53} "This exception derives its guaranty of trustworthiness from the fact that declarant is under such state of emotional shock that his reflective processes have been stilled. Therefore, statements made under these circumstances are not likely to be fabricated. McCormick § 297 (2d ed. 1972)."

{¶ 54} With regard to statement (a), we disagree with the trial court and find that Crutchfield's hand gesture of a spider to his sister Janeen constitutes an excited utterance and, thus, is admissible at trial. In this matter, the record demonstrates that Crutchfield immediately lost consciousness following the shooting and remained that way for nearly a week as he recovered from two extensive surgeries. The first day he regained consciousness, he was awake for only a brief period, was still incoherent, and was only able to hold his sister's hand.

{¶ 55} The next time he awoke was when he made the finger gesture indicating a spider to Janeen. At this time, he was obviously more coherent and awoke to the shocking reality of his condition. Dr. Lechner, Dr. Yowler, and even the defense expert, Dr. Werner Spitz, testified that Crutchfield awoke from the first two surgeries and discovered that he had suffered a massive stroke with paralysis to the left side of his body, with respiratory complications that required a tracheotomy and prolonged mechanical ventilation, a feeding tube inserted into the wall of his abdomen, a catheter in his ureter, and an inability to keep from defecating on the sheets of his bed. One could only imagine the type of shock Crutchfield endured in the first few days he became aware of his condition. In light of these circumstances, we find that Crutchfield, like anyone in his situation, was in a state of "nervous excitement" at the time he made the spider gesture to his sister Janeen, and was unable to engage in any reflective thought regarding the shooting. Accordingly, we reverse the trial court's judgment in this regard and find that statement (a) is admissible under the hearsay exception of an excited utterance.

{¶ 56} For the same reasons, statement (a) constitutes an excited utterance, the statement by Aminah Menefee regarding Crutchfield's hand gesture of a spider listed within statement (f) [2] is likewise admissible. Thus, the trial court erred in denying admission of this statement as well.

---

2. Listed within statement (f) are three separate statements Crutchfield made to Aminah. In this connection, we distinguish between Crutchfield's hand gesture to Aminah and the other

{¶ 57} On the other hand, we agree with the trial court that Crutchfield's statements in (b) through (g), excluding only the hand gesture referred to in statement (f), cannot be classified as excited utterances. At the time he made these statements, he was aware of his current state and the possibility of his future physical well-being. He was writing, talking, walking, and playing on the computer. While he was not, and never would be, his old self, he had time to come to grips with his situation and for reflective thought concerning the occurrences of the shooting. Accordingly, each of these statements were not made while still under the stress of excitement caused by the event and thus do not constitute excited utterances.

{¶ 58} Additionally, having determined that statements (b) through (g), excluding only the hand gesture in statement (f), do not fall within the firmly rooted hearsay exceptions of a dying declaration or excited utterance, we also find that these statements do not bear adequate indicia of reliability in that they do not possess particularized guarantees of trustworthiness, nor do the circumstances remove all temptation to falsehood. See *Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597; *State v. Elkins*, Delaware App. No. 01–CAAA12073, 2002-Ohio-4051, 2002 WL 1821799. Therefore, the trial court did not err in ruling them inadmissible at a trial of this matter.

## II.   CONCLUSION

{¶ 59} In summary, we reverse the decision of the trial court denying admission of Crutchfield's hand gestures of a spider to his sister Janeen and to his girlfriend Aminah as identified in statements (a) and (f), but affirm the trial court's rulings finding inadmissible statements (b) through (i), excluding only the hand gesture described in statement (f).

{¶ 60} Therefore, we affirm in part and reverse in part and remand to the trial court for proceedings consistent with this opinion.

Judgment accordingly.

BLACKMON, P.J., and CELEBREZZE, J., concur.

---

two verbal statements made to her at a later date that are subject to the separate analysis of excited utterances provided infra.