IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






AP-74,430






STEVEN MICHAEL WOODS, a/k/a HALO, Appellant



v.



THE STATE OF TEXAS





ON DIRECT APPEAL


FROM DENTON COUNTY





 

 Price, J., delivered the opinion of the Court, in which Keller, P.J.,
Meyers, Johnson, Keasler, Hervey, Holcomb, and Cochran, JJ., joined. 
Womack, J., filed a dissenting opinion.


O P I N I O N



 In August 2002, a Denton County jury convicted the appellant, Steven Michael
Woods, of killing Ronald Whitehead and Bethena Brosz. (1) Pursuant to the jury's answers
to the special issues set forth in Texas Code of Criminal Procedure Article 37.071, §§
2(b) and 2(e), the trial court sentenced the appellant to death. (2) Direct appeal to this Court
is automatic. (3) The appellant raises seventeen points of error challenging his conviction
and sentence. We will affirm.

I. VOIR DIRE


 In points of error fifteen, sixteen, and seventeen, the appellant argues that the trial
court improperly restricted his questioning of prospective jurors during voir dire. He
contends that, as a result, he was unable to intelligently exercise peremptory challenges
and challenges for cause.

 The trial court has broad discretion over the jury selection process. (4) Voir dire
could go on indefinitely if the trial court did not have the ability to impose reasonable
limits on it. (5) A trial court abuses its discretion only when it prohibits a proper question
about a proper area of inquiry. (6) A question is proper if it seeks to discover a juror's views
on an issue applicable to the case. (7) However, an otherwise proper question is
impermissible if it attempts to commit the juror to a particular verdict based on particular
facts. (8) A voir dire question that is so vague or broad in nature as to constitute a global
fishing expedition is also improper and may be prevented by the trial court. (9)

A. Commitment Question


 The appellant asserts in point of error fifteen that the trial court improperly limited
his voir dire questioning of venire member Kerri Denise Wyrick during the following
exchange:

Q. And it mentions on there if you find sufficient mitigating circumstance
or circumstances to warrant that a sentence of life imprisonment rather than
a death sentence be imposed. It says "sufficient mitigating circumstance or
circumstances." So do you understand that to mean that even one
mitigating circumstance, if it's sufficient, is enough to award a life penalty
instead of a death penalty?


A. I understand.


Q. Could you do that even if you'd already found a defendant guilty
beyond a reasonable doubt of committing a capital murder, you'd found
special issue number 1, that the State proved that beyond a reasonable
doubt, that you found on special issue number 2 that the State proved that
beyond a reasonable doubt? If the State did all that, could you still support
and vote for a life punishment if you found a sufficient mitigating
circumstance?


 [PROSECUTOR]: I object to contracting.


 THE COURT: Sustained, the way it's phrased.


Q. Would you be able to follow the law as to special issue number 3 if you
found even one sufficient mitigating circumstance?


A. Yes.


Defense counsel did not exercise a challenge for cause or a peremptory challenge against
Wyrick, and she was seated on the jury.

 The appellant argues that the question was proper because it sought to discover
Wyrick's views on an issue applicable to the case, that is, whether she could fairly
consider the mitigation special issue even if the jury had already answered yes to the
future dangerousness and anti-parties special issues. (10) The trial court sustained the State's
objection that it was an improper commitment question. (11) A commitment question can be
proper or improper, depending on whether the question leads to a valid challenge for
cause. (12) For a commitment question to be proper, one of the possible answers to that
question must give rise to a valid challenge for cause. (13) If Wyrick had answered the
question "no," then she would have been challengeable for cause. (14) Thus, the trial court
erred in refusing to allow the question to be asked.

 The appropriate standard of harm is to disregard the error unless a substantial right
has been affected. (15) A substantial right is affected when the error has a substantial and
injurious effect or influence in determining the jury's verdict. (16) 

 The trial court's denial of a proper question in this case did not have a substantial
or injurious effect or influence in determining the jury's verdict because defense counsel
was able to ask Wyrick essentially the same question. After the trial court sustained the
State's objection, defense counsel immediately asked her, "Would you be able to follow
the law as to special issue number 3 if you found even one sufficient mitigating
circumstance?" and she replied, "Yes." Point of error fifteen is overruled.

B. Improper Questions


 The appellant complains in point of error sixteen that the trial court prevented him
from asking venire member Michael Rudolf Ziegler the following question: "Could you
be fair and impartial in a murder case where the people killed were under 25 years of
age?" The prosecutor objected that the question was "contracting," and the trial court
sustained the objection. Defense counsel exercised a peremptory strike against Ziegler.

 The appellant similarly asserts in point of error seventeen that the trial court
improperly limited his voir dire questioning of venire member Jerry Linsley during the
following exchange:

Q. Can you be impartial in this case if the victims were young?


 [PROSECUTOR]: Objection, contracting.


 THE COURT: Sustained.


Q. Can you consider the life penalty where the victims were young?


 [PROSECUTOR]: Objection, contracting. He's trying to get him to
commit to a certain set of facts, being that the victims were young.


 THE COURT: Sustained.


Q. Can you be impartial if one of the victims is a young woman?


 [PROSECUTOR]: Objection. Contracting again.


 THE COURT: Sustained.


Q. Can you consider the life penalty if a victim was a young woman?


 [PROSECUTOR]: Objection. Contracting.


 THE COURT: Sustained.


Defense counsel then said that he wanted to ask the same four questions of every venire
member. He asked the trial court for a running objection with regard to all subsequent
jurors. The trial court replied: "Well, I've sustained the objection on this juror, and if the
exact same question were asked of subsequent jurors, the Court's ruling would be the
same." Defense counsel did not exercise a challenge for cause or a peremptory strike
against Linsley, and he was seated on the jury. 

 The questions that the appellant sought to ask Ziegler, Linsley, and the other venire
members in this case are similar to the questions that we held to be improper in Barajas v.
State. (17) In Barajas, defense counsel desired to ask whether venire members could be
impartial in an indecency case involving a victim who was eight to ten years old or, in the
alternative, a victim who was nine years old. (18) Defense counsel also sought to ask
whether venire members could consider probation in a case involving a victim who was
eight to ten years old. (19) We held in Barajas that these questions constituted global fishing
expeditions and the trial court was within its discretion to prevent defense counsel from
asking them. (20) The trial court did not abuse its discretion in preventing a similar fishing
expedition in the instant case. Points of error sixteen and seventeen are overruled.

II. LIMITED CROSS-EXAMINATION

 In points of error seven and eight, the appellant argues that the trial court
improperly prevented him from cross-examining the State's witness Brian Young about
his prison sentence and his prospects for parole. At the time of the appellant's trial,
Young was serving a sentence for aggravated assault. Prior to calling Young to testify,
the prosecutor made an oral motion in limine seeking to bar defense counsel from
questioning Young about the fact that he was currently in custody and about the length of
his sentence. The trial court granted the motion in limine and permitted defense counsel
to question Young about the specifics of his conviction outside the presence of the jury
for purposes of the record. In response to defense counsel's questions, Young testified
that he had served nearly eight months of his two-year sentence and that he was aware of
the possibility that he could be placed on parole, but that no one promised him anything in
exchange for his testimony. When defense counsel asked Young if he expected "some
kind of favorable treatment or good time" in exchange for his testimony, he responded:
"From my understanding, my case does not merit good time because it is an aggravated
charge, and as for the rest of that, I have absolutely no idea." The following exchange
took place after defense counsel finished questioning Young:

THE COURT: Is it your position that you intend to try to ask those
questions in front of the jury?


[DEFENSE COUNSEL]: It is, Judge.


THE COURT: Is there an objection from the State?


[PROSECUTOR]: We object, Your Honor. Irrelevant, improper
impeachment under 609, and there are no offers or agreements in exchange
for his testimony.


THE COURT: I'm going to sustain the objection. The record has been
made.


[DEFENSE COUNSEL]: Yes, ma'am.


 The appellant argues on appeal that the limitation on his cross-examination of
Young violated his rights under the Confrontation Clause of the Sixth Amendment and
Rule 613(b) of the Texas Rules of Evidence. 

 The proponent of evidence to show bias must show that the evidence is relevant. 
The proponent does this by demonstrating that a nexus, or logical connection, exists
between the witness's testimony and the witness's potential motive to testify in favor of
the other party. (21) We have found a nexus when a witness has been indicted or is serving a
period of community supervision. (22) In such cases, the witness is placed in a vulnerable
position and may have a motive to testify in favor of the State.

 In this case, the appellant asked Young if he expected favorable treatment or good
time in exchange for his testimony. Young said that he was ineligible for good time and
that he had no idea about other potential favorable treatment. And, in fact, Young was
ineligible for good time. (23) There was no indication that Young had the expectation that
he would be rewarded for testimony favorable to the State or punished for testimony that
was unfavorable to the State. The appellant's offer of proof did not establish a nexus
between Young's testimony and his prison sentence.

 Points of error seven and eight are overruled.

III. ADMISSION OF EVIDENCE

 In points of error nine, ten, eleven, and twelve, the appellant argues that the trial
court erred in admitting the testimony of David Samuelson and Staci Schwartz. The
appellant specifically complains that these two witnesses improperly testified about
statements made to them by the appellant's co-defendant, Marcus Rhodes. The appellant
argues that the trial court improperly admitted this evidence under the "statement against
interest" exception to the hearsay rule in Texas Rule of Evidence 803(24). He also asserts
that the admission of this evidence violated his rights under the Sixth Amendment's
Confrontation Clause. 

 The State presented evidence that the appellant and Rhodes shot Ronald
Whitehead and Bethena Brosz in a secluded area in The Colony, Texas, in the early
morning hours of May 2, 2001. (24) The appellant, Rhodes, Whitehead, Samuelson, and
Schwartz all knew each other from Insomnia, a coffee shop they frequented in downtown
Dallas. Samuelson testified that he had talked to Rhodes at Insomnia on the evening of
May 1, and Rhodes stated that "he had a job to do" for the appellant that night and that he
did not want to do it. Schwartz testified that she had had a conversation with Rhodes at
Insomnia on the afternoon of May 2, during which Rhodes stated that he and the appellant
had used Brosz's credit card to make an online purchase of tickets to an anime festival. 
Rhodes told Schwartz that they had attempted to make Samuelson look responsible for
the murders by buying the tickets in his name and having them sent to his house.

A. Rule of Evidence 803(24)


 In order for a declaration against interest to be admissible under Rule 803(24), the
statement must be self-inculpatory with corroborating circumstances to indicate the
trustworthiness of the statement. (25) The appellant does not assert that Rhodes's statements
were insufficiently self-inculpatory. He instead argues that there was insufficient
corroboration of Rhodes's statements. The corroboration must clearly indicate the
trustworthiness of the statement. (26) 

 A number of factors are relevant to this inquiry: (1) whether the guilt of the
declarant is inconsistent with the guilt of the defendant; (2) whether the declarant was so
situated that he might have committed the crime; (3) the timing of the declaration; (4) the
spontaneity of the declaration; (5) the relationship between the declarant and the party to
whom the statement was made; and (6) the existence of independent corroborative facts. (27) 
The first two factors, as the Austin Court of Appeals has noted, logically apply only when
the defendant is the proponent of the statement against interest that tends to exculpate the
defendant. (28) When the statement is offered by the State to inculpate the defendant, as in
the case before us, the first two factors are not relevant.

 Rhodes spontaneously made the statements to Samuelson and Schwartz, his
acquaintances from Insomnia who knew Whitehead but were not connected to the
commission of the murders. He made the statement to Samuelson prior to the
commission of the murders. He made the statement to Schwartz not long after the
commission of the murders. These were "street corner" statements that Rhodes made to
his friends without any motive to shift blame to another or minimize his own involvement
in the murders. Thus, the timing and spontaneity of the statements tend to establish their
reliability.

 The State also presented evidence of independent corroborative facts that verified
the reliability of Rhodes's statements to Samuelson and Schwartz. Samuelson testified
that he received a denied credit card charge for admission to an anime festival in the mail,
and that the charge was in Brosz's name. The murders took place on the night that
Rhodes said he had a job for the appellant to do. 

 The physical evidence and the appellant's own admissions demonstrate that the
appellant and Rhodes acted in concert throughout the commission of the offense. The
testimony of Samuelson and Schwartz was admissible under Rule 803(24) because there
were sufficient corroborating circumstances to indicate the trustworthiness of Rhodes's
statements.

B. Confrontation Clause


 We next turn to the appellant's argument that the testimony of Samuelson and
Schwartz was inadmissible under the Confrontation Clause. The threshold question is
whether Rhodes's statements were testimonial or non-testimonial in nature. (29) Prior to the
Supreme Court's decision in Crawford, hearsay statements were admissible for purposes
of the Confrontation Clause if they possessed adequate "indicia of reliability." (30) The
Supreme Court in Crawford, however, drew a distinction between testimonial and non-testimonial statements. (31) The Supreme Court declined to spell out a comprehensive
definition of testimonial, but it stated that the term "applies at a minimum to prior
testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police
interrogations." (32) The Supreme Court held that "[w]here testimonial statements are at
issue, the only indicium of reliability sufficient to satisfy constitutional demands is the
one the Constitution actually prescribes: Confrontation." (33)

 Rhodes's statements to Samuelson and Schwartz do not fall within the categories
of testimonial evidence described in Crawford. They were casual remarks that he
spontaneously made to acquaintances. (34) Rhodes's statements were non-testimonial in
nature; thus, the new rule articulated in Crawford is not applicable in this case. Points of
error nine, ten, eleven, and twelve are overruled.

IV. JURY CHARGE


 In point of error thirteen, the appellant argues that the trial court erred by
submitting part of the Geesa instruction in its charge to the jury during the guilt phase of
the trial. (35) We held in Geesa that trial courts must define reasonable doubt in their jury
charges and mandated the following six paragraph jury instruction:

[1] All persons are presumed to be innocent and no person may be
convicted of an offense unless each element of the offense is proved beyond
a reasonable doubt. The fact that a person has been arrested, confined, or
indicted for, or otherwise charged with, the offense gives rise to no
inference of guilt at his trial. The law does not require a defendant to prove
his innocence or produce any evidence at all. The presumption of
innocence alone is sufficient to acquit the defendant, unless the jurors are
satisfied beyond a reasonable doubt of the defendant's guilt after a careful
and impartial consideration of all the evidence in the case. 


[2] The prosecution has the burden of proving the defendant guilty and it
must do so by proving each and every element of the offense beyond a
reasonable doubt, and if it fails to do so, you must acquit the defendant. 


[3] It is not required that the prosecution prove guilt beyond all possible
doubt; it is required that the prosecution's proof excludes all "reasonable
doubt" concerning the defendant's guilt. 


[4] A "reasonable doubt" is a doubt based on reason and common sense
after a careful and impartial consideration of all the evidence in the case. It
is the kind of doubt that would make a reasonable person hesitate to act in
the most important of his own affairs. 


[5] Proof beyond a reasonable doubt, therefore, must be proof of such a
convincing character that you would be willing to rely and act upon it
without hesitation in the most important of your own affairs. 


[6] In the event you have a reasonable doubt as to the defendant's guilt after
considering all the evidence before you and these instructions, you will
acquit him and say by your verdict "Not guilty." (36) 


 In Paulson v. State, we overruled the portion of Geesa that required trial courts to
instruct juries on the definition of reasonable doubt. (37) The appellant argues that the trial
court's submission of a portion of the Geesa instruction was reversible error under
Paulson. In this case, the trial court submitted paragraphs [1], [2], [3], and [6] of the
Geesa instruction. (38) It did not submit paragraphs [4] and [5]. On appeal, the appellant
challenges only the trial court's inclusion of paragraph [3]. He acknowledges that he did
not object to the inclusion of paragraph [3] at trial, but argues that the alleged error
caused him egregious harm, necessitating reversal under Almanza v. State. (39)

 We held in Paulson that "the better practice is to give no definition of reasonable
doubt at all to the jury." (40) We specifically criticized paragraphs [4] and [5] of the Geesa
instruction as attempting to define reasonable doubt. (41) The instruction in the instant case
did not contain these paragraphs. The trial court did not abuse its discretion by including
paragraph [3] of the Geesa instruction in the jury charge at the guilt or innocence phase of
the trial. Point of error thirteen is overruled.

 In point of error fourteen, the appellant argues that the trial court erred by
submitting a definition of reasonable doubt in its charge to the jury during the punishment
phase. The appellant specifically complains about the following portions of the
punishment charge:

It is not required that the State prove Special Issue No. 1 beyond all possible
doubt; it is required that the State's proof excludes all reasonable doubt
concerning the defendant.


* * *


It is not required that the State prove Special Issue No. 2 beyond all possible
doubt; it is required that the State's proof excludes all reasonable doubt
concerning the defendant.


The appellant again complains of the trial court's use of the language contained in
paragraph [3] of the Geesa instruction. He again acknowledges that he did not object to
the inclusion of this paragraph, but argues that the alleged error caused him egregious
harm. (42) The appellant's argument fails for the same reasons expressed in point of error
thirteen. Point of error fourteen is overruled. 

V. ADMISSIBILITY OF STATEMENT


 In his sixth point of error, the appellant complains of erroneously admitted
evidence during the punishment phase of his trial. He challenges the admission of the
audio-taped statement that he gave to a California detective regarding his involvement in
an uncharged offense. The statement pertained to the murder of Beau Sanders, the
manager of Insomnia whose body was discovered in the desert area located southwest of
Las Vegas, Nevada. The appellant asserts that the statement was inadmissible because it
was not taken in compliance with the dictates of Texas Code of Criminal Procedure
Article 38.22.

 Article 38.22, Section 3(a)(2) provides that no oral statement of an accused made
as a result of custodial interrogation shall be admissible against him in a criminal
proceeding unless, prior to the statement but during the recording, he is given the warning
in Section 2(a) and he knowingly, intelligently, and voluntarily waives the rights set out in
the warning. The appellant must be warned of the following rights under Section 2(a):

 (1) he has the right to remain silent and not make any statement at all and
that any statement he makes may be used against him at his trial;


 (2) any statement he makes may be used as evidence against him in court;


 (3) he has the right to have a lawyer present to advise him prior to and
during any questioning;


 (4) if he is unable to employ a lawyer, he has the right to have a lawyer
appointed to advise him prior to and during any questioning; and


 (5) he has the right to terminate the interview at any time.

Strict compliance with all portions of Section 3(a) is required. (43) The appellant
specifically contends that his statement was inadmissible because the California detective
failed to inform him that he had the right to terminate the interview at any time. 

 Detective Brad Toms of the San Bernardino County Sheriff's Department
questioned the appellant at the Denton County Jail in January 2002. (44) The purpose of the
interview was to find out information about the disappearance of Sanders, who had been
missing since March 2001. Prior to taking the appellant's statement, Toms read him his
rights from a card issued by the San Bernardino Sheriff's Department. He advised the
appellant that he had the right to remain silent, that any statement he made could be used
against him, that he had a right to a lawyer, and that if he was unable to employ a lawyer
that one would be appointed for him. He did not advise the appellant that he had a right
to terminate the interview at any time. 

 In his statement, the appellant told Toms that Sanders wanted to go to California
and that Rhodes, Jeremy Stark, and Matthew Potts gave him a ride. The appellant knew
that Rhodes and Stark actually planned to kill Sanders. The appellant was going to
accompany them on the trip, but his girlfriend convinced him not to go. He lent them his
car instead. He later learned that they shot and killed Sanders in the desert. Rhodes
provided the guns and was present at the time of the murder, but only Stark and Potts shot
Sanders. When they returned to Texas, they were in possession of Sanders's personal
items, including clothing, a hat, compact discs, and a compact disc case, which they
divided up among themselves. The appellant denied that he ordered a "hit" on Sanders. 
He said that Sanders was his friend and that he felt bad about what happened to him. He
did not do anything to prevent the murder, and he did not go to the police because he was
afraid of Rhodes and Stark.

 The appellant objected to the admission of the statement under Article 38.22. The
trial court overruled the appellant's objection and admitted the statement. The State
concedes on appeal that the appellant's statement was not taken in compliance with the
dictates of Article 38.22. The State argues that the appellant's statement was nevertheless
admissible under Article 38.22, Section 3(c), which provides as follows:

Subsection (a) of this section shall not apply to any statement which
contains assertions of facts or circumstances that are found to be true and
which conduce to establish the guilt of the accused, such as the finding of
secreted or stolen property or the instrument with which he states the
offense was committed. 


Under the exception set out in Section 3(c), oral statements asserting facts or
circumstances establishing the guilt of the accused are admissible if, at the time they were
made, they contained assertions unknown by law enforcement but later corroborated. (45) 
Such oral statements need only circumstantially demonstrate the defendant's guilt. (46) 
Furthermore, if such an oral statement contains even a single assertion of fact found to be
true and conducive to establishing the defendant's guilt, then the statement is admissible
in its entirety. (47)

 The State asserts that the appellant's statement is admissible under the Section 3(c)
exception because the police did not know where to find Sanders's body until the
appellant told them. The State further asserts that the police did not know that Sanders
was shot with Rhodes's .380 caliber pistol until the appellant gave his statement. The
State's assertions, however, are not clearly supported by the record. During the interview,
Toms told the appellant that Potts was already in custody in California for Sanders's
murder and that they had a "nice long talk" with him resulting in "thirteen pages of
communication." Toms also stated that Potts told police exactly what happened and how
it happened. 

 Toms described the search for and recovery of Sanders's body during his trial
testimony:

Q. Okay. During the course of your investigation into the disappearance or
missing Beau Sanders, did you ultimately end up going and searching a
particular area of your county?


A. Yes sir, we did.


Q. What area was that?


A. It's a cement road. It's an area south of - or sorry, southwest of Las
Vegas, approximately 45 minutes southwest of Las Vegas.


Q. And what is in this area? What kind of terrain is it?


A. Desert.


Q. Desert for as far as -


A. Open desert.


Q. So to search this type of area, what did ya'll do?


A. What we did was have search and rescue. We contacted volunteers and
asked them to come out and conduct a grid search of a specific area that we
had information that Beau Sanders'[s] body would be located in.


Q. How many times did you go and search this area, the desert area?


A. Two times.


Q. Were you successful or did you find anything the first time you went out
there?


A. The first time we were not successful. We did not find anything at all.


Q. Tell the jury what happened the second time.


A. I actually wasn't present during the search, but the second search, they
went out and located evidence that would - that has now since been proven
to be the body of Beau Sanders.


Q. What kind of evidence did the searchers find?


A. We found clothing, skeletal remains, and gun evidence, fired cartridge
casings.


Q. What type of gun evidence did you find?


A. It was a .380 fired cartridge casing.


 * * *


Q. After the remains were found and identified, did you and your team
come to Texas to talk to witnesses to investigate the matter?


A. Actually, I came to Texas prior to the remains being found.


 * * *


Q. And while you were here in Texas, did you have an opportunity to speak
with Steven Michael Woods?


A. Yes sir, I did.

 

 It is unclear from the record exactly what the police knew about Sanders's murder
before they interviewed the appellant. Toms told the appellant during the interview that
they had already talked to Potts and that he told them exactly what had happened and how
it happened. It appears that the police had already searched the desert once based on
information they received, presumably from Potts, about where Sanders's body was
located. When Toms asked the appellant if he knew where the murder took place, he said
they "pulled off the road" in the "Mojave Reserve." We cannot discern from the record
whether the appellant's description was any more detailed than the one that Potts may
have given. Although Sanders's body was not found until after the appellant's statement,
it appears that the police generally knew where to look for the body before the appellant's
statement.

 The State further notes in its brief on appeal that the appellant also told Detective
Toms about the property from the crime scene taken by Rhodes, Stark, and Potts and that
they had split up the property among themselves. The State concedes, however, that
except for the fact that Mrs. Sanders, the victim's mother, identified a green bag that
belonged to Beau in a photograph of items in the trunk of Marcus Rhodes's car, there is
no indication in the record where and when the rest of the property was recovered. (48) 
Thus, even if the police did not know where to find Sanders's belongings until the
appellant gave his statement, the record does not indicate whether the appellant's
assertions were later corroborated.

 The appellant's statement was not taken in strict compliance with Article 38.22
and the State has not clearly established an exception under Section 3(c). The trial court
erred in admitting the statement. The erroneous admission of the appellant's statement
amounts to non-constitutional error. (49) The appropriate standard of harm is to disregard
the error unless a substantial right has been affected. (50) A substantial right is affected
when the error has a substantial and injurious effect or influence in determining the jury's
verdict. (51)

 Other witnesses testified that the appellant was more involved in Sanders's murder
than he told Toms in his statement. Michael Cavin testified that he and the appellant
were staying at the apartment of a mutual friend in March 2001. Cavin observed the
appellant, Stark, Rhodes, and Potts planning Sanders's murder at that time. The appellant
told Cavin that he was taking Sanders out to California to kill him and that he would kill
Cavin if he told anybody. Cavin was at Insomnia with the group on the night they were
going to leave for California. Rhodes, Stark, Potts, and Sanders left in the appellant's car
and the appellant stayed behind in Dallas. A day or two later, the appellant woke Cavin at
3:00 a.m., pointed a 12-gauge shotgun in his face, and asked him if he was still going to
tell anybody. After the murder, the appellant, Rhodes, Stark, and Potts divided up
Sanders's personal items amongst themselves.

 In addition, Stephen Price testified that he encountered the appellant when the
appellant was in hiding in California after he committed the murders of Whitehead and
Brosz. The appellant told Price that he murdered Whitehead because he "was a threat to
go to the police" about the murder of Sanders that Rhodes and "two other people"
committed in California.

 The testimony of Cavin and Price was stronger evidence of future dangerousness
than the appellant's statement. In his statement, the appellant alleged only minimal
participation and showed some remorse about Sanders's death. According to Cavin and
Price, however, the appellant plotted Sanders's death and killed Whitehead in order to
prevent him from telling the police what he knew about Sanders's murder. 

 And the appellant's involvement in Sanders's murder was not the only evidence of
future dangerousness. The evidence showed that, in the weeks leading up to the murders
of Whitehead and Brosz, the appellant planned to steal money from a clothing store and
to kill a woman named Deborah Handley during a drug transaction. The appellant also
got into a fight with another inmate while incarcerated in the Denton County Jail awaiting
trial. As a juvenile, he made a homemade bomb and committed the offense of "criminal
sexual conduct." Finally, the State introduced a recorded telephone call that the appellant
made the night before the punishment phase in his capital trial began. The appellant tried
to call Detective Toms, who was out of the office, and instead spoke to Detective Boldt
and offered to give more information about to Sanders's murder. The State argued during
closing that this phone call was evidence that the appellant was "still trying to manipulate
people" and that he knew he was "going down" so he was "going to try to take the rest of
his group with him." Given all of this evidence, coupled with the violent and
premeditated murders of Whitehead and Brosz, it is unlikely that the appellant's statement
had a substantial and injurious effect on the jury's verdict at punishment. (52) Point of error
six is overruled.

VI. TEXAS DEATH-PENALTY STATUTE


 The appellant argues his first three points of error together. In his first point of
error, he asserts that the Texas death-penalty statute is unconstitutional because it places
the burden of proving the mitigation special issue on the appellant. In his second point of
error, he contends that the trial court erroneously overruled his motion to hold the Texas
death-penalty statute unconstitutional on this basis. In his third point of error, he argues
that the trial court should have instructed the jury that the State was required to prove
beyond a reasonable doubt that the mitigation issue should be answered in the negative. 
The appellant relies on Apprendi v. New Jersey, (53) and Ring v. Arizona (54) to support his
claims. We have previously rejected such arguments. (55) 

 In his post-submission brief, (56) the appellant argues that Blakely v. Washington (57)
supports his claims and is contrary to our cases interpreting Apprendi and Ring. In
Apprendi, the United States Supreme Court held that "[o]ther than the fact of a prior
conviction, any fact that increases the penalty for a crime beyond the prescribed statutory
maximum must be submitted to a jury, and proved beyond a reasonable doubt." (58) In
Blakely, the Supreme Court defined the term statutory maximum for purposes of an
Apprendi analysis. It held that the statutory maximum

 is the maximum sentence a judge may impose solely on the basis of the
facts reflected in the jury verdict or admitted by the defendant. In other
words, the relevant "statutory maximum" is not the maximum sentence a
judge may impose after finding additional facts, but the maximum he may
impose without any additional findings. When a judge inflicts punishment
that the jury's verdict alone does not allow, the jury has not found all the
facts "which the law makes essential to the punishment," and the judge
exceeds his proper authority. (59)

 The appellant argues that this language in Blakely means that the State must prove
a negative answer to the mitigation special issue beyond a reasonable doubt in order for
the trial judge to impose a sentence of death. More specifically, he argues that after a jury
finds a defendant guilty of capital murder and answers the future dangerousness special
issue "yes," the maximum sentence that can be imposed is a life sentence. Then he argues
that the only way death can be imposed is after an additional finding: The jury must
answer "no" to the mitigation special issue. As a result, he claims that the statutory
maximum, in the absence of the negative mitigation finding, is life imprisonment.

 We disagree with the appellant's conclusion. In Resendiz, we rejected the
argument that the State bears the burden of proving a negative answer to the mitigation
special issue. (60) We reached this conclusion, in that case, because the statutory maximum
for capital murder is fixed at death. (61) Blakely does not affect this holding. 

 In Blakely, Ring, and Apprendi, a trial judge made findings that increased the
defendants' sentences beyond the statutory maximum. The Supreme Court held in these
cases that a finding, other than a prior conviction, that increases the defendant's sentence
beyond the maximum statutory punishment must be found by a jury beyond a reasonable
doubt. Article 37.071 satisfies these requirements.

 Under Article 37.071, the jury makes the findings. The future dangerousness
special issue (62) and the parties special issue, (63) when it applies, must be proven by the State
beyond a reasonable doubt. (64) The mitigation special issue (65) has the potential to reduce the
appellant's sentence, not increase it. As a result, the State need not prove a negative
answer beyond a reasonable doubt. Points of error one, two, and three are overruled. 

 In his fourth point of error, the appellant attacks the Texas death-penalty statute on
the grounds that the mitigation special issue gives the jury unfettered discretion and
permits the arbitrary and capricious imposition of the death penalty. We have previously
rejected such arguments. (66) Point of error four is overruled.

 In his fifth point of error, the appellant complains that the Texas death-penalty
statute is unconstitutional because the mitigation instruction sends the same "mixed
signals" to jurors as the court-made nullification instruction given to the jury in Penry v.
Johnson (Penry II). (67) He asserts that the statutory mitigation instruction sends mixed
signals because it is unclear as to the burden of proof.

 In Hall v. State, (68) we held that the mitigation instruction contained in the Texas
death-penalty statute is a statutory codification of the dictates handed down by the United
States Supreme Court in Penry v. Lynaugh (Penry I). (69) We have previously upheld the
constitutionality of this provision. (70) The Supreme Court also commented on the
difference between the statutory mitigation instruction and the court-made nullification
instruction in Penry II:

A clearly drafted catchall instruction on mitigating evidence also might
have complied with Penry I. Texas' current capital sentencing scheme
(revised after Penry's second trial and sentencing) provides a helpful frame
of reference . . . Penry's counsel, while not conceding the issue, admitted
that he "would have a tough time saying that [Penry I] was not complied
with under the new Texas procedure." (citation omitted). At the very least,
the brevity and clarity of this instruction highlight the confusing nature of
the supplemental instruction actually given, and indicate that the trial court
had adequate alternatives available to it as it drafted the instructions for
Penry's trial. (71)


 The appellant has not convinced us that the statutory mitigation instruction in its
present form is unconstitutional. (72) Point of error five is overruled.

 We affirm the judgment of the trial court.

Delivered: December 15, 2004.

 

Publish.
1. Tex. Pen. Code § 19.03(a).
2. Tex. Code Crim. Proc. art. 37.071, § 2(g).
3. Id., at § 2(h).
4. Sells v. State, 121 S.W.3d 748, 755-56 (Tex. Crim. App.), cert. denied, 124 S.Ct. 911
(2003); Barajas v. State, 93 S.W.3d 36, 38-39 (Tex. Crim. App. 2002).
5. Ibid.
6. Ibid.
7. Ibid.
8. Ibid.; Standefer v. State, 59 S.W.3d 177, 181 (Tex. Crim. App. 2001).
9. Sells, 121 S.W.3d at 756; Barajas, 93 S.W.3d at 39.
10. Tex. Code Crim. Proc. art. 37.071, § 2(e)(1).
11. We understand the prosecutor's "contracting" objection to mean that the question
improperly attempted to commit Wyrick to a particular verdict based on particular facts. 
12. Lydia v. State, 109 S.W.3d 495, 498 (Tex. Crim. App. 2003) (citing Standefer, 59
S.W.3d at 181).
13. Standefer, 59 S.W.3d at 182.
14. Tex. Code Crim. Proc. art. 35.16(c)(2).(providing that the defense may challenge a
venireperson for cause if "he has a bias or prejudice against any of the law applicable to the case
upon which the defense is entitled to rely, either as a defense to some phase of the offense for
which the defendant is being prosecuted or as a mitigation thereof or of the punishment
therefor"). 
15. Tex. R App. P. 44.2(b); see Jones v. State, 982 S.W.2d 386, 391-94 (Tex. Crim. App.
1998) (holding question of harm in voir dire context addressed under Rule 44.2(b)).
16. King v. State, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997).
17. 93 S.W.3d 36 (Tex. Crim. App. 2002).
18. Id., at 38.
19. Ibid.
20. Id., at 41-42.
21. Carpenter v. State, 979 S.W.2d 633, 634 (Tex. Crim. App. 1998).
22. Maxwell v. State, 48 S.W.3d 196, 199 (Tex. Crim. App. 2001) ("Evidence that a witness
whom the State calls is subject to a criminal charge, or is on probation, can be used to show the
bias or interest of the witness in helping the State") (quoting Moreno v. State, 22 S.W.3d 482,
485-86 (Tex. Crim. App. 1999)).
23. See Tex. Gov't Code § 508.145(d) ("An inmate serving a sentence for an offense
described by Section 3g(a)(1)(A), (C), (D), (E), (F), (G), or (H), Article 42.12, Code of Criminal
Procedure, or for an offense for which the judgment contains an affirmative finding under
Section 3g(a)(2) of that article, is not eligible for release on parole until the inmate's actual
calendar time served, without consideration of good conduct time, equals one-half of the
sentence or 30 calendar years, whichever is less, but in no event is the inmate eligible for release
on parole in less than two calendar years").
24. Whitehead was dead when emergency personnel arrived at the scene at 6:55 a.m. 
Brosz died about twenty-four hours after she was taken to the hospital. 
25. Dewberry v. State, 4 S.W.3d 735, 751 (Tex. Crim. App. 1999).
26. Ibid. (citing Davis v. State, 872 S.W.2d 743, 749 (Tex. Crim. App. 1994)).
27. Davis, 872 S.W.2d at 749.
28. See Drone v. State, 906 S.W.2d 608, 613 (Tex. App.--Austin 1995, pet. ref'd).
29. Crawford v. Washington, 124 S. Ct. 1354 (2004).
30. Ohio v. Roberts, 448 U.S. 56, 66 (1980).
31. 124 S. Ct. at 1374.
32. Ibid.
33. Ibid.
34. See Crawford, 124 S. Ct. at 1364 ("An accuser who makes a formal statement to
government officers bears testimony in a sense that a person who makes a casual remark to an
acquaintance does not."); see also United States v. Manfre, 368 F.3d 832, 838 n.1 (8th Cir. 2004)
(noting comments made to loved ones or acquaintances are not the kind of memorialized,
judicial-process-created evidence of which Crawford speaks); see also People v. Cervantes, 118
Cal. App. 4th 162, 174 (Cal. App. 2d Dist. 2004) (holding that co-defendant's statement to a
neighbor that he did not reasonably anticipate would be used at trial was non-testimonial in
nature).
35. Geesa v. State, 820 S.W.2d 154 (Tex. Crim. App. 1991). 
36. Ibid.
37. 28 S.W.3d 570, 573 (Tex. Crim. App. 2000).
38. The trial court submitted paragraphs [1], [2], [3], and [6] verbatim with one exception. 
The last line of paragraph [1] was shortened to read as follows: "The presumption of innocence
alone is sufficient to acquit the defendant."
39. 686 S.W.2d 157 (Tex. Crim. App. 1984).
40. Id., at 573.
41. Id., at 572.
42. Almanza, 686 S.W.2d at 171.
43. Tex. Code Crim. Proc. art. 38.22, § 3(e); Nonn v. State, 117 S.W.3d 874, 879 (Tex.
Crim. App. 2003); Davidson v. State, 25 S.W.3d 183, 185 (Tex. Crim. App. 2000).
44. Detectives Smith, Garza, and Little were also present during the interview. 
45. Moore v. State, 999 S.W.2d 385, 400 (Tex. Crim. App. 1999).
46. Id., at 400-01.
47. Id., at 401.
48. Citation omitted.
49. Nonn, 117 S.W.3d at 881.
50. Tex. R App. P. 44.2(b).
51. Nonn, 117 S.W.3d at 881.
52. Nonn, 117 S.W.3d at 881.
53. 530 U.S. 466 (2000).
54. 536 U.S. 584 (2002).
55. Bell v. State, 938 S.W.2d 35, 54 (Tex. Crim. App. 1996); Moore v. State, 935 S.W.2d
124, 126-28 (Tex. Crim. App. 1996).
56. Oral argument in this case was heard on June 23, 2004. The United States Supreme
Court delivered Blakely v. Washington, 124 S. Ct. 2531 (2004), on which the appellant's post-submission brief relies, on June 24, 2004.
57. Ibid.
58. Apprendi, 530 U.S. at 490.
59. Blakely, 124 S. Ct. at 2537 (citations omitted).
60. Resendiz, 112 S.W.3d at 550.
61. Ibid.
62. The future dangerousness special issue asks the jury to decide "whether there is a
probability that the defendant would commit criminal acts of violence that would constitute a
continuing threat to society." Tex. Code Crim. Proc. art. 37.071, §2(b)(1).
63. The parties special issue asks the jury to decide "in cases in which the jury charge at the
guilt or innocence stage permitted the jury to find the defendant guilty as a party under Sections
7.01 and 7.02, Penal Code, whether the defendant actually caused the death of the deceased or
did not actually cause the death of the deceased but intended to kill the deceased or another or
anticipated that a human life would be taken." Id., at art. 37.071, §2(b)(2).
64. Id., at art. 37.071, §2(c).
65. The mitigation special issue asks the jury to decide "[w]hether, taking into consideration
all of the evidence, including the circumstances of the offense, the defendant's character and
background, and the personal moral culpability of the defendant, there is a sufficient mitigating
circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death
sentence be imposed." Id., at art. 37.071, §2(e)(1).
66. Bell v. State, 938 S.W.2d 35, 54 (Tex. Crim. App. 1996); Moore v. State, 935 S.W.2d
124, 126-28 (Tex. Crim. App. 1996).
67. 532 U.S. 782 (2001).
68. 67 S.W.3d 870, 877 (Tex. Crim. App. 2002).
69. 492 U.S. 302 (1989).
70. Jones v. State, 119 S.W.3d 766, 790 (Tex. Crim. App. 2003), cert. denied, 124 S.Ct.
2836 (2004); Shannon v. State, 942 S.W.2d 591, 598 (Tex. Crim. App. 1996).
71. 121 S. Ct. 1923-24.
72. Jones, 119 S.W.3d at 790.